**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Anthony Ruiz DEL VIZO,
Defendant–Appellant.**

**No. 89–50141.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 30, 1990.

Decided Nov. 8, 1990.

David G. Freedman, Miller & Holguin,
Los Angeles, Cal., for defendant-appellant.

John L. Carlton, Asst. U.S. Atty., Los
Angeles, Cal., for plaintiff-appellee.

Before NELSON, BRUNETTI and
O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine the constitutionality
of a warrantless arrest of Anthony Ruiz

Del Vizo and of a variety of subsequent searches. Because we conclude that there was probable cause for appellant's arrest, we affirm the district court's judgment of conviction for two narcotics offenses.

## I

In August 1988, relying on a confidential informant's tip, officers of the Torrance Police Department began surveillance of a house at 23302 Anza in Torrance, California.. Police continued this surveillance from September 1 through September 6, 1988.

On September 3, 1988, officers followed Julio Balmaceda as he drove from the Anza address to various Western Union offices. The officers observed Balmaceda driving in a "counter-surveillance" manner—he would quickly pull over to the curb and allow cars to pass, he made U-turns, and he circled the neighborhood.

On September 6, 1988, officers observed Manuel Suastegui meet with Balmaceda inside the Anza residence. Officers followed Suastegui as he drove away from the house in a red Ford Bronco. Approximately five miles away, officers observed Anthony Ruiz Del Vizo driving a Plymouth Voyager van. Del Vizo and Suastegui began driving in tandem. Officers observed both using cellular telephones and frequently checking their rear view mirrors.

Del Vizo stopped for gas at a station in Cerritos. Suastegui parked the Bronco in front of the gas station, approached Del Vizo, and conversed with him. After a few minutes, both men returned to their respective vehicles and continued to drive in tandem.

Del Vizo drove the van to a house located at 13357 Ashworth in Cerritos, where he parked in the driveway and spoke with Manuel Ibarra. Meanwhile, Suastegui drove his Bronco past the Ashworth residence without stopping. Suastegui then made a U-turn and headed back to the gas station where he and Del Vizo had met earlier. When Del Vizo finished his discussion with Ibarra, he returned to the gas station on foot, leaving the van in the driveway of the Ashworth residence. At the gas station, Del Vizo entered Suastegui's Bronco and the two drove to a shopping mall, where they parked and then meandered through the mall.

The surveillance officers remaining at the Ashworth residence noticed that Ibarra came outside to look into Del Vizo's van at least twice in the first five to ten minutes after Del Vizo had left. Approximately thirty minutes later an unidentified male arrived at the Ashworth house in a pick-up truck and met with Ibarra in front of the house. After a brief discussion, the two entered the house. Moments later, the newcomer came out carrying a plastic bag containing a sharp rectangular object inside; the package was of a size that it might have contained a kilogram of cocaine. The unidentified man placed the bag inside a utility box in the rear of his pick-up truck and drove away. The officers observed him circle the area in what appeared to be a counter-surveillance manner before driving onto the freeway.

Ten minutes later, Ibarra left the Ashworth house carrying a box measuring three feet by two feet. Ibarra placed the box inside Del Vizo's van. A few minutes later, Hector Ramos arrived in a pick-up truck and parked. After a brief discussion with Ibarra, Ramos left in Del Vizo's van.

Officers followed the van from the Ashworth house to a house at 12234 Brittain in Hawaiian Gardens. Ramos drove in a counter-surveillance manner from the Ashworth house to the Brittain house: he circled the area, made U-turns, drove faster than the speed limit, and frequently pulled the van to the right curb to let traffic go by before resuming driving. At the Brittain house, Ramos parked the van partially down the driveway. Ramos got out and removed the box that Ibarra had placed in the van; he took the box into the Brittain house.

Twenty minutes later, Ramos exited the house with another individual. Both got into Del Vizo's van and drove to an apartment at 21925 Claretta in Hawaiian Gardens. Again, officers following Ramos saw him drive in a counter-surveillance

manner. At the Claretta address (an apartment complex), officers could not see exactly where Ramos went. However, some twenty minutes later, officers saw Ramos leave, still driving Del Vizo's van. The van now appeared to be carrying some cargo, as it sat lower in the rear. Ramos drove back to the aforementioned Ashworth house in Cerritos. This time, he carefully obeyed all traffic laws, drove well below the posted speed limit, and did not commit any traffic infractions as before.

Back at the Ashworth house, Ramos met briefly with Ibarra after he parked Del Vizo's van in front of the house. Ramos then departed in his pick-up truck. Ibarra went to the rear portion of the van and checked it before going back into the house. Later, Ibarra came out again and checked the doors of the van, apparently to see whether they were locked.

Minutes later, Ibarra exited the house with another individual and drove to a nearby supermarket, where he made telephone calls from a public telephone before returning to the Ashworth house. Minutes later, Del Vizo and Suastegui returned in the Bronco to the Ashworth house. Suastegui there dropped off Del Vizo and then drove off to the nearby gas station; Suastegui appeared to hide at the station. Del Vizo meanwhile met briefly with Ibarra in front of the Ashworth house before getting into the van and driving away.

Del Vizo drove the van more slowly than the existing flow of traffic and allowed other cars to pass him before he got onto the freeway. Minutes later, Suastegui caught up to him on the freeway, and Suastegui's Bronco and Del Vizo's van once again were driven in tandem.

Police officers then decided to make a stop of both vehicles, based upon their observations and their belief that a drug transaction had just occurred. Two marked Torrance patrol cars stopped both the Bronco and van. At gunpoint, Del Vizo was ordered out of the van and forced to lie down on the street; he was then handcuffed. After being handcuffed, Del Vizo was asked whether he spoke English, and he responded affirmatively. He was told that he was being detained pending a narcotics investigation. The officers also asked Del Vizo if he would consent to a search of the Voyager van. Del Vizo consented. When the officers told Del Vizo that he did not have to consent, Del Vizo reaffirmed his consent.

Before searching the van, the police looked into it through its windows. In the back of the van, in plain view through the windows, they could see plastic bags with packages inside. The officers suspected that the bags contained cocaine or other drugs and brought a narcotics-detection dog to the scene. The dog alerted the officers to the presence of drugs in the van. The officers then searched the van and found 104 kilograms of suspected cocaine in the bags. A field test indicated that the substance in the bags was indeed cocaine. The officers also found in the van documents indicating that the van was registered to Del Vizo and specifying Del Vizo's residence. Suastegui and Del Vizo were arrested for narcotics trafficking and their vehicles were impounded.[1]

On September 20, 1988, Del Vizo and six other defendants were indicted on seven counts of various narcotics offenses. Del Vizo pleaded not guilty at his arraignment. Del Vizo also filed a motion to suppress evidence, contending that he had been arrested without probable cause. After an evidentiary hearing, the district court denied the suppression motion on November 7, 1988.

On January 3, 1989, Del Vizo withdrew his pleas of not guilty to two counts of the indictment[2] and entered conditional guilty

---

1. Searches of various residences and vehicles of the conspirators yielded additional evidence, including cocaine, ledgers, and $186,000 in cash.

2. The two counts to which Del Vizo pleaded guilty were conspiracy to launder narcotics proceeds, *see* 18 U.S.C. §§ 371, 1956(a)(1) (1988),

pleas [3] on those counts. Defendant was sentenced to 190 months' imprisonment and five years' supervised release. The remaining counts were dismissed at the government's motion, and a judgment of conviction was entered on June 17, 1989.

Del Vizo timely appeals the denial of the suppression motion. We have jurisdiction under 28 U.S.C. § 1291.

## II

We first inquire whether Del Vizo was under arrest by the time cocaine was discovered in his van. The district court concluded alternatively (1) that Del Vizo's initial detention amounted to a mere investigatory stop which ripened into an arrest only after the discovery of the cocaine, or (2) that there was probable cause to arrest Del Vizo at the time the van was stopped.[4] We conclude that Del Vizo had been arrested prior to the discovery of the cocaine, and treat the question of probable cause in the succeeding section.[5]

■ In determining whether an official detention has ripened into an arrest, we consider the "totality of the circumstances." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir.1988), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989). There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning. *United States v. Pinion*, 800 F.2d 976, 978–79 (9th Cir.1986), *cert. denied*, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987); *see also United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir.1988) ("we review the situation from the perspective of the person seized").

■ In this case, the circumstances surrounding Del Vizo's detention included an order to alight from his vehicle and subsequent handcuffing, all done by officers brandishing weapons. Under the totality-of-the-circumstances standard, none of these factors alone is dispositive. For example, holding a suspect at gunpoint does not necessarily convert an investigatory stop into an arrest. *See, e.g., United States v. Alvarez*, 899 F.2d 833, 838–39 (9th Cir.1990) (officers did not arrest defendant when they approached his vehicle with guns drawn and ordered defendant to step out of his car), *petition for cert. filed*, 59 U.S.L.W. 3180 (U.S. Sept. 5, 1990) (No. 90–420); *United States v. Taylor*, 716 F.2d 701, 708–09 (9th Cir.1983) (investigatory stop and not arrest occurred when police approached suspects with drawn guns after having been warned that the suspects were dangerous). Similarly, the fact that the officers handcuffed a suspect does not, in itself, automatically escalate a stop into an arrest. *See, e.g., United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982) (handcuffing justified by possibility that another suspect lurked in the vicinity), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983).

In *Delgadillo–Velasquez*, we were confronted with a situation similar to the one presented in this case. The police in *Delgadillo–Velasquez* had detained three suspects by approaching the suspects with weapons drawn, ordering them to halt, and requiring them to lie face down in the street while they were handcuffed. We held that at this point the suspects were under arrest. *See* 856 F.2d at 1295. We

---

and possession of cocaine with intent to distribute, *see* 21 U.S.C. § 841(a)(1) (1988).

**3.** *See* Fed.R.Crim.P. 11(a)(2). Del Vizo reserved his right to seek review of the denial of the suppression motion.

**4.** We note that the district court engaged in the oft-criticized practice of adopting wholesale the findings and conclusions drafted by the prevailing party. "Indeed, the court merely crossed out the word 'proposed' in entering the challenged findings." *Alvernaz Farms, Inc. v. Bank*

*of California (In re T.H. Richards Processing Co.)*, 910 F.2d 639, 643 n. 2 (9th Cir.1990). Hence we will review the district court's dual theories justifying the arrest with special scrutiny. *See id.; Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 n. 3 (9th Cir.1984) (same).

**5.** We review *de novo* the district court's conclusion that there was no arrest prior to the discovery of cocaine. *See United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987). As noted previously, we apply special scrutiny. *See supra* note 4.

observed that "[t]he show of force and detention techniques used in this context are indistinguishable from police conduct in an arrest. . . . Clearly, a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning." *Id.* at 1295–96 (citations omitted).

Although in the instant case the police did not announce to the suspect that he was under arrest, as they did in *Delgadillo–Velasquez,* the distinction is not pivotal. Even without a statement that he was under arrest, the absolute curtailment of Del Vizo's liberty clearly would have lead a reasonable person to believe that he was not free to leave. *Cf. United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974) ("No significant, new restraint was added when [an officer] . . . handcuffed Strickler and formally pronounced him 'under arrest.' ").

It is true, as the government argues, that an investigatory stop will not be converted into an arrest simply when the officers take "reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." *Alvarez,* 899 F.2d at 838. However, the officers' suspicion that Del Vizo may have been involved in drug trafficking did not justify the extent of restraints imposed upon the suspect. There was no evidence that Del Vizo failed to comply with police orders; on the contrary, undisputed testimony in the district court indicated that Del Vizo did exactly as ordered. *Cf. Taylor,* 716 F.2d at 709 (handcuffing justified where suspect disobeyed orders to raise hands and made furtive movements inside truck). There was no other evidence suggesting that Del Vizo was particularly dangerous, especially once he had stepped out of the van, had been frisked and was lying on the ground. *Compare Alvarez,* 899 F.2d at 838–39 (drawn guns did not indicate arrest where police had reason to believe suspect was armed with explosives) *and United States v. Greene,* 783 F.2d 1364, 1367–68 (9th Cir.) (no arrest where police were tipped that defendants were

armed and police frisked them), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986) *with United States v. Robertson,* 833 F.2d 777, 781–82 (9th Cir. 1987) (surrounding suspect and pointing weapons at her amounted to an arrest where officers had no indication that suspect was armed). Indeed, the government cites no case in which we have found "reasonable measures" in a *Terry*-stop to include drawing weapons on a cooperative suspect, ordering him out of his vehicle and to lie prone on the street, *and* handcuffing him.

Given the extensive limits placed on Del Vizo's freedom and the lack of an investigatory justification for the degree of these restraints, we have little difficulty concluding that Del Vizo was arrested before the discovery of cocaine in the back of the van.

### III

Having determined that Del Vizo was arrested before the discovery of cocaine in his van, we next consider whether there was probable cause to support that arrest. The district court found that the investigating officers possessed probable cause to arrest Del Vizo when they stopped Del Vizo's van. We agree.[6]

An arrest must be supported by probable cause. *See Whiteley v. Warden,* 401 U.S. 560, 564–66, 91 S.Ct. 1031, 1034–36, 28 L.Ed.2d 306 (1971) (same probable-cause standard applies for arrest warrant or warrantless arrest). Probable cause exists when the police know "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." *Delgadillo–Velasquez,* 856 F.2d at 1296; *see also Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (same). Courts look to the totality of the circumstances known to the officers prior to any search conducted incident to the arrest. *United States v. Potter,* 895 F.2d 1231, 1233–34 (9th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3247, 111 L.Ed.2d

---

**6.** We review *de novo* the district court's determination of probable cause. *See Delgadillo–Velas-* *quez,* 856 F.2d at 1295. Again, special scrutiny is necessary. *See supra* note 4.

757 (1990). When there has been communication among agents, probable cause can rest upon the investigating agents' "collective knowledge." *United States v. Bernard,* 623 F.2d 551, 560–61 (9th Cir.1979).

■ At the time that Del Vizo was arrested, the police had received a tip that persons residing at 23302 Anza were part of a narcotics organization. They had observed Del Vizo drive his van from Torrance to Cerritos in tandem with co-defendant Suastegui, someone who had been at the Anza residence; during the drive, the two conversed by cellular telephone and frequently appeared to check whether they were being followed. Officers had observed Del Vizo drop off his van at a residence on Ashworth, talk with Ibarra, and then meet Suastegui at a nearby gas station, after which the two drove off together.

At the Ashworth residence, the investigating officers had witnessed Ibarra give a small package to another individual and place a larger package in the van. The officers had observed co-defendant Ramos drive Del Vizo's van (with the package inside) to another address, all the while travelling in a counter-surveillance fashion. Police had witnessed the drop-off of the package from Del Vizo's van and further counter-surveillance driving by Ramos. The officers had observed Ramos visit still another residence, after which he drove the van, which now appeared to be loaded down, in an especially cautious manner back to the Ashworth residence.

Back at the Ashworth residence, officers had observed Ramos's departure in another vehicle and Ibarra's periodic checks on the parked van. The agents witnessed Ibarra leave his residence to use a pay telephone, after which Del Vizo and Suastegui immediately returned to the Ashworth residence. The officers observed Suastegui dropping off Del Vizo and then hiding out in a gas station. The investigators witnessed Del Vizo meet with Ibarra and then drive off in the van, proceeding cautiously. Finally, the officers observed Suastegui rejoin Del Vizo as the two drove in tandem back toward Torrance.

Many of the observations or circumstances described above have been thought to be indicants of illegal activity. For example, tandem or erratic driving may be indicative of criminal goings-on. *See, e.g., United States v. Robert L.,* 874 F.2d 701, 703–04 (9th Cir.1989) (considering evidence of erratic driving and driving in tandem); *United States v. Medina–Gasca,* 739 F.2d 1451, 1454 (9th Cir.1984) (considering driving in tandem). Similarly, driving or acting in a counter-surveillance fashion can be another indicant of criminal activity. *See, e.g., United States v. Rodriguez,* 869 F.2d 479, 483 (9th Cir.1989) (counter-surveillance driving and parking included in affidavit establishing probable cause); *United States v. Hoyos,* 892 F.2d 1387, 1393 (9th Cir.1989) (noting relevance of use of counter-surveillance techniques while driving); *Bernard,* 623 F.2d at 559–60 (considering defendants' counter-surveillance activities near drug laboratory). The use of public, rather than private, telephones is typical of narcotics traffickers and may be taken into account in evaluating probable cause. *See Hoyos,* 892 F.2d at 1393. Of course, a confidential informant's tip also figures into the determination of whether probable cause existed. *See, e.g., Rodriguez,* 869 F.2d at 482–83 (considering tips in determining probable cause); *United States v. Roberts,* 747 F.2d 537, 544 (9th Cir.1984) (tip which could not establish probable cause by itself contributes to finding of probable cause). Another circuit has noted "the practice followed by some drug dealers of hiding" until the deal is consummated so that they can claim to be innocent bystanders in the event of governmental interference in the transaction. *See United States v. Ashcroft,* 607 F.2d 1167, 1171 (5th Cir.1979), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2944, 64 L.Ed.2d 826 (1980).[7]

---

**7.** In determining whether there was probable cause to arrest Del Vizo, the police were not limited to considering only Del Vizo's observed activities. Of course, a person's mere proximity to others engaged in criminal activity is insufficient to establish probable cause to search or arrest that person. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 90–92, 100 S.Ct. 338, 341–43, 62

In considering whether the investigating officers here had probable cause to believe that Del Vizo was participating or had participated in the commission of a crime, we are not swayed by the presence or absence of any particular observation alone. Rather, we are impressed by the wealth of information gathered by the officers and the extent to which that information revealed a "pattern of activity" indicating participation in a narcotics transaction. *See United States v. Espinosa,* 827 F.2d 604, 610 (9th Cir.1987) (following tip, officers observed pattern of activity consistent with participation in a drug ring), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988). It is of no moment that the acts of Del Vizo and his confederates, if viewed separately, might be consistent with innocence: "Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *Bernard,* 623 F.2d at 560 (quotation omitted). Although the

question is a close one, under all of the circumstances, we are satisfied there was sufficient information to warrant a prudent person's belief that Del Vizo was involved in a narcotics transaction.[8]

For these reasons, we conclude that Del Vizo's arrest was supported by probable cause.

## IV

Our conclusion that Del Vizo's arrest prior to the search of his van was constitutional disposes of the other issues raised on appeal.[9] The district court correctly denied Del Vizo's motion to suppress evidence.

AFFIRMED.

---

L.Ed.2d 238 (1979) (probable cause to search a tavern and a particular bartender due to the bartender's alleged involvement in narcotics did not justify the warrantless search of patrons of the bar who were in no way connected with the supposed drug-dealing); *United States v. Robertson,* 833 F.2d 777, 782–83 (9th Cir.1987) (a woman's mere presence on the grounds of an alleged drug laboratory was insufficient for probable cause to arrest her); *cf. United States v. Vaughan,* 718 F.2d 332, 334 (9th Cir.1983) (mere presence in vehicle with two persons for whom the police possessed arrest warrants did not give rise to probable cause; "the agents were not aware of any involvement by him in the conspiracy.... [F]or all the agents knew at the time they detained Vaughan and searched his briefcase, he could have been a hitchhiker.").

However, where the police's observations give them a reasonable belief that the observed person is a part of the criminal enterprise, then the probable cause to arrest will extend to him as well. *See, e.g., United States v. Rodriguez,* 869 F.2d 479, 481–83 (9th Cir.1989) (where there was probable cause to arrest ring-leader of narcotics gang, there was also probable cause to arrest two men who took delivery of a van with large boxes inside; "[t]hey were seen as participants in a chain of conduct that was considered by the police to be an ongoing criminal operation"); *United States v. Hillison,* 733 F.2d 692, 697–98 (9th Cir.1984) (after two known drug dealers were arrested with cocaine, there was probable cause to arrest man who was observed staying near and meeting with both); *United States v. Lomas,* 706 F.2d 886, 892 (9th Cir.1983)

(where there was probable cause to arrest participants in sting operation, two suspicious-looking types who were apparently standing lookout could be arrested as well), *cert. denied,* 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984). We have no difficulty concluding that Del Vizo's observed conduct was sufficient for the police reasonably to infer participation in the criminal enterprise. *See Hillison,* 733 F.2d at 697. The police had certainly seen enough to know that Del Vizo was not some "innocent visitor," *see Robertson,* 833 F.2d at 782, or "a hitchhiker," *see Vaughan,* 718 F.2d at 334.

8. *See also United States v. Leon,* 460 F.2d 299 (9th Cir.1972). In *Leon,* border officials knew that they were in a prime smuggling area, that defendant had rented an automobile and motel room, and that defendant was a suspected narcotics dealer. These officials had probable cause to arrest when they had observed a nighttime meeting with a foreigner, after which suspects were seen with loaded bags and foil-wrapped items. *Id.* at 300. Similarly, in this case the officers had been tipped that narcotics activity centered around the Ashworth residence and had observed activity which closely matched the profile of a drug transaction with vehicle switches, meetings, a point man, counter-surveillance measures, and mysterious packages.

9. Del Vizo asserts that his on-site consent to a search of the van was tainted by his illegal arrest. However, because the arrest was not

illegal, the admitted consent carries no taint. Del Vizo's contention that the warrants for subsequent searches of various residences were defective, in that they were based upon the discovery of cocaine in Del Vizo's van during the purportedly illegal search, is meritless for the same reason.