**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry D. MILNER, Defendant–Appellant.**

No. 90–50187.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1992.

Decided April 23, 1992.

Terry Amdur, Pasadena, Cal., for defendant-appellant.

Gregory W. Alarcon, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before: FARRIS, NOONAN and TROTT, Circuit Judges.

FARRIS, Circuit Judge:

Larry Milner appeals his jury conviction for conspiracy and possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (1988). He argues that his conviction was invalid because: 1) the district judge made prejudicial comments during the voir dire; 2) evidence of past drug use was improperly admitted; 3) the prosecutor improperly "vouched" for the credibility of a government witness; and 4) the police lacked probable cause. We affirm.

In May, 1988, Larry Milner asked Diana Watson to act as a courier for a drug transaction. She declined. On June 2, 1988, Milner went to Watson and asked her to "take [a] package" to Detroit. Milner promised Watson $1500, and Watson accepted.

After missing an early flight, the two checked in at a nearby airport hotel. Milner gave Watson some money to purchase a jacket and pantyhose. After her return, Milner gave her a package wrapped in brown paper and instructed her on the proper method of drug concealment. Milner attached bundles of cocaine and marijuana to the brown package and Watson placed the entire bundle under her pantyhose.

Around midnight, the two departed for the Los Angeles airport. After arriving at

the airport, Milner walked inside and surveyed the terminal. He then walked outside and had Watson join him in the ticket line.

Two Los Angeles Police Detectives, Everett Gossett and Patti May, were working undercover in the Narcotics Smuggling Detail at the airport terminal. They observed Milner as he entered, left and re-entered the ticket line with Watson. They noticed that Milner wore sunglasses, seemed nervous and carried no luggage. They also observed that Watson wore a fur coat, which was unusual because it was a warm night. She was walking unsteadily, in a manner that suggested she was concealing something under her dress. Watson carried two briefcases and one small nylon bag. Milner purchased two one-way tickets to Detroit.

Watson and Milner left for the departure gate. Gossett and May approached the two, identified themselves and asked for identification. Watson produced a California driver's license and Milner a birth certificate. The airline tickets were issued to "D. Watson" and "L. Watson". Milner explained the discrepancy by stating that Watson had made the reservation. Both stated they were not carrying any drugs or large quantities of cash.

May asked for permission to search the bags and discovered that one briefcase was empty while the other only contained papers. Gossett conducted a pat-down search of Milner but discovered nothing. After searching Watson's purse, Watson removed her coat and inquired whether May wanted to search her person. May discovered a hard object in Watson's groin area. Believing the object to be drugs, May immediately placed Watson under arrest. Milner spontaneously turned around and put his hands behind his back to be cuffed. He was placed under arrest as well. The package was later found to contain one pound of heroin and small quantities of marijuana and cocaine.

On June 3, 1988, Watson and Milner were charged with possession of heroin with intent to distribute. After the charges were dropped against Milner, Watson entered into an agreement to plead guilty for a lesser sentence of conspiracy in return for her cooperation in the government's case against Milner. Watson received a 366 day sentence and no additional post-jail supervised time.

On June 30, 1989, the government again indicted Milner on two counts: 1) conspiracy to possess heroin with intent to distribute; and 2) possession of heroin with intent to distribute. On January 8, 1990, Judge Rea held that the government had probable cause to arrest Milner, and denied his motion to suppress evidence. Just before trial, the case was assigned to another judge, Senior District Judge A. Andrew Hauk.

While on bail, Milner violated release conditions and was placed back in confinement. During jury selection, Milner was dressed in civilian clothing, and three deputy United States Marshals dressed in matching blue blazers sat directly behind him. When one of the Marshals left the courtroom, the district judge made the following comments:

THE COURT: Now somebody is leaving the courtroom. Well, so that the jury knows, we're not just seating prospective jurors. The gentlemen in question here, the defendant, is in custody and the two persons who are sitting immediately behind him are United States Marshals which we permit for security sake, security of the jurors, security of the Court, security of everybody.

MR. AMDUR (Counsel for Milner): Excuse me, Your Honor. May we approach the bench for a moment?

THE COURT: No. No. No. I know defendants don't like to say that, but it's true. And I don't fool around with a lot of gobbly gook.

Those two men there, the one that just left, I wondered what was going on, were marshals. They trade off; and the only other solution is using handcuffs and leg irons. We don't do that, try not to, unless we have somebody like Norega [sic], which we don't have. So let's remember that.

You can't show any bias against the man because he is being watched by per-

sons who, at the order of the Court, are participating in what we call security, necessary security, in view of all the facts at the hands of the Court.

That doesn't mean this is any indication of the guilt of the defendant. Not at all. It means that we just want to be sure that there is no breach of security and no flight. But it does not indicate in the slightest degree any indication of guilt. That's to be determined by you the jurors under the instructions of the Court that I will be giving you in due course.

Counsel for Milner moved for a mistrial, which Judge Hauk denied. At trial's end, Judge Hauk gave the following instruction:

The fact that the defendant may be in custody, of course, does not mean that the defendant committed the offenses charged or any other offense. Defendants are committed to custody and released from custody for a wide variety of reasons not relevant to your consideration. The fact that a defendant is or is not in custody should not enter into your deliberations in any way.

Milner was convicted on both counts and was sentenced to eighty seven months. This appeal followed.

## DISCUSSION

### I. *Fair Trial*

██ Milner first argues that Judge Hauk's voir dire comments deprived him of a fair trial. Although we review the district court's voir dire for an abuse of discretion, *United States v. Powell*, 932 F.2d 1337, 1340 (9th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 256, 116 L.Ed.2d 210 (1991), facts that may have deprived Milner of a fair trial are reviewed de novo. *Norris v. Risley*, 918 F.2d 828, 830 (9th Cir.1990).

The Supreme Court has permitted the use of identifiable security officers for security purposes in the courtroom. *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). Guards do not necessarily indicate that a defendant is "particularly dangerous or culpable." *Id.* at 569, 106 S.Ct. at 1346. Jurors can and do draw a wide number of inferences from the presence of security personnel in the courtroom; many of which do not suggest that the defendant is particularly dangerous or culpable. *Id.* Our duty is to assess the risk of prejudice to determine whether specific conduct was "so inherently prejudicial as to pose an unacceptable threat to [the] right to a fair trial." *Id.* at 572, 106 S.Ct. at 1347.

In *Halliburton,* we affirmed a conviction although two jurors momentarily observed the defendant in handcuffs during a recess. *United States v. Halliburton*, 870 F.2d 557 (9th Cir.), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989). We held that several curative measures undertaken by the district court "eliminated the risk of actual prejudice to Halliburton's right to a fair trial." *Id.* at 561. These measures included: 1) allowing Halliburton to later appear without restraint during recesses; 2) instructing the marshals to be more discreet; and 3) instructing the jury that the custody status of a defendant is irrelevant to determine guilt or innocence. *Id.* at 562. *See also United States v. Acosta–Garcia,* 448 F.2d 395, 396 (9th Cir.1971) (mere fact that some jurors viewed defendants in handcuffs was not so prejudicial as to require a mistrial).

In *United States v. Bland,* 908 F.2d 471, 473 (9th Cir.1990), we held that the judge's comments during voir dire concerning an unrelated charge against the defendant for molestation, torture and murder of a seven year old girl warranted reversal. Although the judge later gave curative instructions, we observed that "this is one of those cases where the prejudice could not be removed by curative instructions." *Id.*

Judge Hauk's comments border on those we found so troubling in *Bland.* During oral argument, even the government conceded that the comments were inappropriate. Judge Hauk suggested that the reason Milner was surrounded by court officers was for security; "security of the jurors, security of the Court, security of everybody." This suggested that Milner posed a security risk. It was improper for Judge Hauk to dismiss Mr. Amdur's con-

cerns as "gobbly gook". Further, Judge Hauk improperly suggested that Milner warranted special security by commenting that the security was "necessary security, in view of all the facts at the hands of the court."

Inappropriate remarks do not mandate a new trial. Milner must still establish that he was prejudiced by these comments. *See Halliburton*, 870 F.2d at 561. Since his attorney did not voir dire the jurors, we must determine whether Judge Hauk's conduct violated Milner's right to a fair trial. *Id.*

Judge Hauk's later curative instructions, taken as a whole, sanitized his inappropriate comments. Immediately after his statement about the marshals, Judge Hauk noted that custody "does not indicate in the slightest degree any indication of guilt." Although he hinted that security was necessary "in view of all the facts at the hands of the Court," he immediately told the jury that Milner's status "doesn't mean this is any indication of the guilt of the defendant." In his instructions to the jury before deliberation, he gave a statement identical to the one we approved in *Halliburton*, which required the jury to disregard the custodial status of the defendant during deliberations. *See Halliburton*, 870 F.2d at 562. On this record, we cannot say that Judge Hauk's improper comments were so prejudicial that his later curative remarks were unavailing.

*Bland* is not controlling. Unlike the district court in *Bland*, Judge Hauk did not tell the jury venire "specific facts underlying the warrant [that] had no significant additional probative value and unfairly prejudiced" Milner. *Bland*, 908 F.2d at 473. The curative statements removed any prejudice caused by the voir dire comments.

Moreover, the record reflects that Judge Hauk made several damaging comments to the prosecutor as well. At various times during the trial, he chastised the United States Assistant Attorney for "pounding" a line of questioning, told him to "knock [leading questions] off" and said his cross-examination of Milner was "idiotic". These improper statements reduced the credibility of the government.

We mention these statements to illustrate Judge Hauk's propensity for harmful and gratuitous comments. His most damaging statements were those made in front of the jury during voir dire. In reviewing the entire record, however, we cannot say that Judge Hauk's conduct warrants a new trial.

## II. *Watson's Testimony*

Milner asserts that evidence of his drug use with Watson was highly prejudicial and precluded a fair trial. Judge Rea had originally ruled that Milner's prior drug use was not admissible, but reserved the right to reconsider his order during trial. During the course of the trial, counsel for Milner objected after Watson testified that Milner "got high" in the hotel room prior to departing for the airport. In sidebar, Judge Hauk stated that his interpretation of Judge Rea's ruling allowed the matter to be revisited: "When it came up, I would rule." He reasoned that Milner's drug use "ha[d] to do with credibility" regardless of whether Milner had taken the stand.

 Under Fed.R.Evid. 403, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Although the district judge need not state explicitly that it is performing the required balancing, the record must show that the balancing occurred. *See United States v. Johnson*, 820 F.2d 1065, 1069 (9th Cir. 1987). We review Rule 403 determinations for an abuse of discretion. *United States v. Perkins*, 937 F.2d 1397, 1400 (9th Cir. 1991).

 Counsel for Milner made reference to Judge Rea's prior Rule 403 determination. This was sufficient to meet the balancing requirements of Rule 403. *Johnson*, 820 F.2d at 1069. The drug use testimony was relevant to show a connection between Watson's possession and Milner's knowledge of the drugs. It was therefore relevant as to Milner's state of mind to

prove that he conspired to distribute drugs. The district court did not abuse its discretion.

### III. *The Plea Agreement*

■ During direct examination of Watson, the terms of the plea agreement were disclosed. Although it was not entered into evidence, in closing argument the prosecutor stated that Watson was "fulfilling her part of the plea agreement, and now has no hold under her to even come forward." In rebuttal, he labeled defense counsel's suggestion that the plea agreement was coercive "absurd". Milner contends that the prosecutor committed misconduct by: 1) testifying to matters outside the evidence in stating that the government would not re-indict Watson if she breached her plea agreement; and 2) improperly vouching for Watson by suggesting that she was under no obligation to testify.

■ It is improper for the government to vouch for the credibility of a government witness by: 1) placing the prestige of the government behind the witness; or 2) indicating that information not presented to the jury supports the witness's testimony. *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980). The prosecutor did not commit either of these errors. He properly characterized the terms of the plea agreement. His rebuttal was merely a response to Milner's suggestion that the government forced Watson to testify. Further, the government established the terms of the plea agreement during Watson's testimony; therefore, the prosecutor's closing argument did not introduce new evidence. The district court did not abuse its discretion. *See United States v. Makhlouta*, 790 F.2d 1400, 1403 (9th Cir.1986).

### IV. *Probable Cause*

■ Finally, Milner asserts that the Hyatt hotel bill and cocaine-laced cigarettes found during his arrest should have been suppressed because the detectives lacked probable cause. Probable cause exists when the police have reasonably trustworthy information sufficient to lead a prudent person to believe that the accused has committed or is committing a crime. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.1990). Police may use their experience, special training, and expertise to determine that probable cause existed. *Texas v. Brown*, 460 U.S. 730, 742–43, 103 S.Ct. 1535, 1543–44, 75 L.Ed.2d 502 (1983) (plurality opinion).

■ At the time of Milner's arrest, the police knew that: 1) Milner was wearing sunglasses at night; 2) he "scanned" the airport and acted nervous; 3) he paid cash for the airline tickets; 4) both Milner and Watson said they would be gone for five days, but their bags contained no clothing; 5) Milner's ticket had a false name on it; 6) Milner was accompanied by Watson, who was found to be carrying narcotics before Milner's arrest; and 7) Milner suggested his own complicity by assuming a handcuffed position after Watson's arrest. The government established probable cause. *See United States v. Erwin*, 803 F.2d 1505, 1510–11 (9th Cir.1986). Because the totality of circumstances suggest that Milner was involved in a narcotics transaction, the subsequent search of Milner was incident to a lawful arrest. *Del Vizo*, 918 F.2d at 823–35. *See also New York v. Belton*, 453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

AFFIRMED.

TROTT, Circuit Judge, Dissenting:

While Milner was on bail awaiting trial, he violated the conditions of his release relating to the use of drugs. As a result, he was returned to custody. At trial, he was dressed in civilian clothing, but was in the custody of several deputy United States Marshals dressed in matching blue blazers who sat directly behind him. As one of the marshals left the courtroom during jury selection, the following ensued:

THE COURT: Now somebody is leaving the courtroom. Well, so that the jury knows, we're not just seating prospective jurors. The gentleman in question here, the *defendant, is in custody* and *the two persons who are sitting immediately behind him are United States Marshals which we permit for security sake, se-*

*curity of the jurors, security of the Court, security of everybody.*

MR. AMDUR [defense counsel]: Excuse me, Your Honor. May we approach the bench for a moment?

THE COURT: No. No. No. I know defendants don't like to say that, but it's true. And *I don't fool around with a lot of gobbly gook.*

*.... the the only other solution is using handcuffs and leg irons.* We don't do that, try not to, unless we have somebody like Norega [sic], which we don't have. So let's remember that.

You can't show any bias against the man because *he is being watched by persons* who, at the order of the Court, are participating in what we call *security, necessary security, in view of all the facts at the hands of the Court.*

That doesn't mean this is any indication of the guilt of the defendant. Not at all. It means that we just want to be sure that there is *no breach of security and no flight.* But it does not indicate in the slightest degree any indication of guilt. That's to be determined by you the jurors under the instructions of the Court that I will be giving you in due course.

(Emphasis added.)

A motion for a mistrial based on this exchange was later promptly made by Milner's counsel and denied. Members of the jury venire were not questioned regarding their ability to be impartial despite (1) Milner's custody status and (2) the security precautions requiring that Milner be "watched." Apparently the deputy marshals remained with Milner throughout the trial. At the close of evidence, the jury was instructed that Milner's custody should not influence their decision as to guilt or innocence. The instruction did not address the presence of a security force.

### A

Milner argues the judge's statements were improper and deprived him of a fair trial. Because Milner has not shown actual prejudice, we must determine whether the facts were " 'so inherently prejudicial as to pose an unacceptable threat' to the right to a fair trial." *Norris v. Risley,* 918 F.2d 828, 830 (9th Cir.1990) (quoting *Holbrook v. Flynn,* 475 U.S. 560, 572, 106 S.Ct. 1340, 1347, 89 L.Ed.2d 525 (1986)). An occurrence such as this in a courtroom "is inherently prejudicial if 'an unacceptable risk is presented of impermissible factors coming into play.' " *Id.* (quoting *Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976)).

### B

Often a trial court finds itself obligated to simultaneously discharge clashing duties. The trial which engendered this appeal is a good example. On the one hand, it was incumbent upon the court to strive to preserve impartiality and to avoid allowing anything to undermine the defendant's presumption of innocence. On the other hand, the trial court was charged with the duty to preserve the safety of counsel, jury, witnesses, spectators—in short, everyone inside the courtroom. Our concern is whether in attempting to reconcile the two duties, the lower court abused its discretion and deprived the defendants of a fair trial. Such inquiry depends upon the peculiar facts to which each appeal is wed.

*United States v. Clardy,* 540 F.2d 439, 442–43 (9th Cir.) (citation omitted), *cert. denied,* 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976).

Judge Moore's general observation in *Clardy* was made more specific by the Supreme Court in *Holbrook,* when it observed that "it is possible that the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." 475 U.S. at 569, 106 S.Ct. at 1346 (quotation omitted). What is true with respect to the sight of a security force is also true with respect to the jurors' recognition that a defendant is in custody. Building on *Holbrook,* we observed in *United States v. Halliburton,* 870 F.2d 557 (9th Cir.1988), *cert. denied* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989), that "[a] jury's

observation of the defendant in custody may under certain circumstances 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy' which can unfairly prejudice a defendant's right to a fair trial notwithstanding the validity of his custody status." *Id.* at 559 (quoting *Holbrook,* 475 U.S. at 569, 106 S.Ct. at 1346).

### C

In the present case, the jury venire did not just see that the defendant was in custody, they were explicitly told by the court of his incarcerated status. The court did not merely advise the jury venire that the defendant was in custody, however, but went on to indicate the reasons for the defendant's incarceration—security. Moreover, the court singled out and identified the visible security force sitting right behind Milner and told the jury venire that the persons watching him were United States Marshals. A lay person is likely to attach great significance to this impressive title and to infer from it that Milner required special attention even though he was not an *internationally known* drug trafficker like Manuel Noriega.

In addition, the district court personalized and particularized the security threat by telling the jury venire that the security was "necessary security, *in view of all the facts at the hands of the court.*" (Emphasis added.) Such a statement could reasonably and easily have been interpreted by the jury venire as meaning the court had learned of *facts* that made *this defendant* a security risk, as well as facts showing that he was likely to flee the jurisdiction of the court. The court also said that the marshals were present to protect not only the general security of the courtroom, but of "the jurors, ... of everybody." It is highly probable that this was taken by the jury venire to mean the defendant was in custody because he was a present security threat to the jurors themselves, the court, and indeed to the world at large.

Such an explanation is not proper. Telling jurors that a defendant is in custody because he is a threat to their security is precisely the type of statement that "may affect a juror's judgment." *Williams,* 425 U.S. at 505, 96 S.Ct. at 1693. It poses an unacceptable threat to the "fairness of the fact-finding process," *id.* at 503, 96 S.Ct. at 1693, because it "brands" a defendant in the jury's eyes with " 'an unmistakable mark of guilt.' " *Holbrook,* 475 U.S. at 571, 106 S.Ct. at 1347 (quoting *Williams,* 425 U.S. at 518, 96 S.Ct. at 1700) (Brennan, J., dissenting)). *Cf. Morgan v. Aispuro,* 946 F.2d 1462, 1465 (9th Cir.1991) (no reason for the jury to infer that the defendant was the reason for security measures). Such a statement erodes the presumption of innocence to which a defendant is entitled. "[C]ourts must be alert to factors that may undermine the fairness of the fact-finding process ... [and] guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Williams,* 425 U.S. at 503, 96 S.Ct. at 1693.

Telling prospective jurors that Milner was not as bad as Manuel Noriega, and so handcuffs and leg irons were not necessary, only aggravated the effect of the court's unnecessary and improper advisement. This gratuitous remark only confirmed Milner as a risk to security by in essence telling the jurors that the marshals were an adequate substitute for leg irons and handcuffs. Moreover, the inappropriate comparison of Milner to Noriega—both of whom were charged with drug trafficking—was hardly designed to cast Milner in a favorable light in the eyes of the jurors. The comparison was tantamount to telling the jurors that a big fish drug trafficker who poses a security threat is held in leg irons and handcuffs (which is untrue), while a little fish drug trafficker can be controlled with a security force sitting right behind him.

The context of this remarkably inappropriate comparison cannot be ignored. It was no accident that the court in January of 1990 referred to Manuel Noriega. The United States invaded Panama on December 20, 1989, in part because of the "anti-American" activities of Panama's dictator, Manuel Noriega, who had previously been

indicted in federal court in Florida for drug trafficking. Noriega, however, eluded arrest and a massive manhunt ensued. For days the manhunt was the subject of continuous television, radio, newspaper, and magazine coverage. Unquestionably Noriega was the world's #1 drug trafficking fugitive. After he surrendered, he was flown to Florida where he was arraigned in federal court on January 4, 1990, just fifteen days before his fresh and negative image was conjured up for Milner's jury venire to explain why Milner, although also charged with drug trafficking, was not in leg irons and handcuffs. It is highly probable that each and every prospective juror knew who "Norega" was and about his adventures, his indictment for drug trafficking, his flight from arrest, and his capture. To mention Milner and Noriega in the same category, albeit at different levels, was highly prejudicial.

It is difficult to conceive of a situation where it is appropriate to explain to a jury either the *reasons* for the custody status of a defendant or for the presence of a defendant-caused security force in the courtroom. The justification for custody necessarily conveys negative information to the jury about a defendant's behavior or character that impinges on his right to a fair trial, as does the justification for a security force directed at his person. By justifying a defendant's custody status to a jury in terms of security needs based on "facts" at the hands of the court, a court not only overlooks its responsibility to protect a defendant's rights, but it creates the very risk that a trial judge must assiduously guard against. Instead, a judge confronted with a need for visible security measures related to a defendant's custody status must take precautionary steps to ensure that such measures do not infringe upon the defendant's rights.

### D

The district court's attitude in the present case deserves attention. When Milner's attorney attempted to approach the bench in response to the court's erroneous reference to custody and security needs—manifestly trying to protect his client's right to a fair trial—the district court said, "No. No. No. I know defendants don't like to say that, but it's true. And *I don't fool around with a lot of gobbly gook.*" (Emphasis added.) The concerns addressed in *Holbrook* are not gobbly gook. A defendant's right to a fair trial is not gobbly gook. A trial court's responsibility to protect a defendant's right to a fair trial is not gobbly gook. It is difficult to discern exactly what the court meant by "gobbly gook," which is a term that thus far has not made it into Black's Law Dictionary, but the court's attitude—including its refusal to permit Milner's counsel to be heard—betrays an insufficient sensitivity towards the fair trial problems inherent in (1) the presence of security forces in a courtroom, and (2) parading before a jury the fact that a defendant is in custody.

### E

The law calls on us to answer this question: Did the trial court's remarks create an unacceptable risk of impermissible factors coming into play? My answer is yes. The court's remarks clearly created an unacceptable threat to Milner's right to a fair trial and thus were inherently prejudicial. The remarks conveyed the idea that Milner was dangerous and untrustworthy. When he testified, he did so with this cloud hanging over his character and his credibility. This was a handicap that is irreconcilable with the presumption of innocence. The curative statements relied on by the government to salvage this case were not sufficient to erase the court's own mistake or to eliminate this risk. All the court did was tell the jurors not to let the facts that Milner was dangerous and untrustworthy influence their decision on the question of his guilt. Far from curing the mistake, it was left standing. Moreover, the cautionary instruction at the end of the trial spoke only of Milner's custody status. Not a word was said in the court's instructions about the security force that had been called in to guard Milner.

When a trial judge attempts to unring an impermissible bell that he himself has

rung, he sends at best mixed messages. In such situations, a judge's impartiality and authority is tainted and compromised by his own mistake, especially when the attempted unringing boils down, as it does here, to an ineffective statement that the jurors should *separate* the security risk presented by the defendant from the issue of his guilt.

This case is distinguishable from *Halliburton* and those cases where the risk was *not* created by the trial judge and where the trial judge took immediate and effective steps to cure a problem inadvertently created by others. *See United States v. Johnson,* 735 F.2d 1200, 1201 (9th Cir. 1984); *United States v. Acosta–Garcia,* 448 F.2d 395, 396 (9th Cir.1971).

### F

Milner, in my view, has been convicted without due process of law. He is entitled to a new trial. Therefore, I respectfully DISSENT.