26 F.3d 135
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lester Charles THOMPSON, Defendant-Appellant.
 Nos. 90-50598, 92-50150.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 3, 1994.
Decided May 18, 1994.
 
 1
 Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Lester Thompson appeals his convictions for mail and wire fraud in violation of 18 U.S.C. Sec. 1343, interstate transportation of stolen property obtained by fraud in violation of 18 U.S.C. Sec. 2314, income tax evasion in violation of 26 U.S.C. Sec. 7201 and filing false income tax returns in violation of 26 U.S.C. Sec. 7306(1). We affirm.
 
 I. SUFFICIENCY OF EVIDENCE
 A. Knowing Participation in the Scheme
 
 4
 The evidence was sufficient to convict Thompson of knowing participation in the fraudulent scheme. Goldberg's testimony regarding his discussion of hedging with Thompson was sufficient to show Thompson knew BNGA failed to hedge. U.S. v. Mares, 940 F.2d 455, 458 (9th Cir.1991) ("The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict."). Moreover, the fraudulent scheme alleged in the indictment involved a series of misrepresentations, including BNGA's reputation as an investment firm, the experience of its salespeople, the risk to customers who invested through the firm and the percentages of customers' funds that would be used to pay for BNGA's expenses. There was sufficient evidence for the jury to conclude that Thompson, as Sales Manager, was aware of these misrepresentations, any one of which was enough to show intent to defraud. U.S. v. Wellington, 754 F.2d 1457, 1462 (9th Cir.1985) (government not required to prove every fraudulent act alleged in the indictment).
 
 B. Withdrawal from the Scheme
 
 5
 Thompson was properly convicted for conduct occurring after he resigned from BNGA on August 22, 1986. "Withdrawal ends the defendant's knowing participation [in the fraudulent scheme] and therefore can negate the element of use of the mails or wires," U.S. v. Lothian, 976 F.2d 1257, 1263 (9th Cir.1992), unless the "use of the mails or wires occurring after the withdrawal is the foreseeable result of actions taken by the defendant or co-schemers during the defendant's participation in the scheme." Id. at 1265. "To withdraw from a [scheme] a defendant must either disavow the unlawful goal of the [scheme], affirmatively act to defeat the purpose of the [scheme], or take definite, decisive, and positive steps to show that [defendant's] disassociation from the [scheme] is sufficient." Id. at 1261 (citations and internal quotations omitted). Once the defendant "has introduced prima facie evidence of withdrawal from the scheme, the government must introduce evidence" sufficient to support a finding that the defendant did not withdraw or that each charged use of the mails or wires was ... foreseeable...." Id. at 1263.
 
 
 6
 Thompson's resignation was not a complete withdrawal from the scheme. He did not "disavow the unlawful goal" or attempt to "defeat the purpose" of the scheme when BNGA was sold; instead, he urged the sales force to stay with the enterprise, falsely telling them the business was being sold to "M.S. Sawyer," a large, financially sound New York company. Moreover, on September 19, 1986, he received a $24,000 check from Goldberg representing his portion of BNGA's August, 1986 income.[1] Reisman v. U.S., 409 F.2d 789, 792-93 (9th Cir.1969) (no withdrawal where defendant resigned and ceased to participate in day-to-day operations of the company because he remained a major stockholder and took no action to disavow or defeat the activities he helped set in motion); compare Lothian, 976 F.2d at 1264 (prima facie showing of withdrawal where defendant resigned from company, had nothing to do with company's operations and received no financial benefit from the company's activities).
 
 II. EVIDENCE OF OTHER FRAUDULENT ACTIVITIES
 
 7
 The district court did not abuse its discretion under Rule 404(b) by admitting evidence of Thompson's involvement with First American Currency before joining BNGA and with Schoolhouse Coins after joining BNGA. Evidence of "other acts" is admissible under Rule 404(b) if four conditions are met: "(1) sufficient evidence must exist for the jury to find that the defendant committed the other acts; (2) the other acts must be introduced to prove a material issue in the case; (3) the other acts must not be too remote in time; and (4) if admitted to prove intent, the other acts must be similar to the offense charged." U.S. v. Ayers, 924 F.2d 1468, 1473 (9th Cir.1991).
 
 A. Involvement With First American Currency
 
 8
 The evidence regarding Thompson's involvement with First American Currency satisfied the requirements of Rule 404(b). Thompson's importation of techniques for defrauding customers from First American Currency to BNGA was relevant to show his knowing participation in the scheme and his intent to defraud. His activities at First American Currency were not too remote in time--they occurred no more than two months before Thompson joined BNGA. Ayers, 924 F.2d at 1474 (acts occurring within two years of charged conduct not too remote); U.S. v. Ross, 886 F.2d 264, 267 (9th Cir.1989) (acts occurring twelve years before charged conduct not too remote).
 
 B. Involvement With Schoolhouse Coins
 
 9
 The evidence regarding Thompson's involvement with Schoolhouse Coins was also properly admitted. Wayne Pederson's testimony that 1) Thompson knew the operation was fraudulent before the purchase and, 2) he and Thompson "discussed that we were over 30,000 coins short of the required amount to be on hand," and 3) Thompson implemented a plan to buy 30,000 wheat pennies so that Schoolhouse "would at least have a coin per coin for each client," and that this plan was fraudulent "because they weren't the coins we sold," was sufficient to show Thompson "committed the other acts."
 
 
 10
 Contrary to Thompson's contention, the Schoolhouse operation was "similar" to that of BNGA. Both companies solicited investments by telephone and misrepresented to customers that they were obtaining valuable commodities--precious metals or coins--for their money. See U.S. v. Jenkins, 785 F.2d 1387, 1395 (9th Cir.1986) (prior fraudulent conduct in obtaining conventional loans relevant to fraudulent intent in obtaining funds from the FHA); U.S. v. Scelzo, 810 F.2d 2, 4 (1st Cir.1987) (participation in prior credit card scheme admissible to show fraudulent intent where both schemes involved supplying valid cardholder information, including names, account numbers and expiration dates, providing counterfeit cards for imprinting by merchants and signing fraudulent credit sales slip even though some peripheral facts, such as whether the sales slips were signed in or out of the presence of the merchants, differed); U.S. v. DeCastris, 798 F.2d 261, 264-65 (7th Cir.1986) (evidence that defendant lied on forms submitted to other entities in the past was relevant to show intent to falsify application for disability benefits).
 
 
 11
 The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The acts were highly probative of Thompson's fraudulent intent and the district court "gave an appropriate instruction limiting the purpose for which the jury could consider" those acts. U.S. v. Arambula-Ruiz, 987 F.2d 599, 604 (9th Cir.1993).[2]
 
 III. PROSECUTORIAL MISCONDUCT
 A. Comment on Failure to Call a Witness
 
 12
 The prosecutor did not violate Thompson's Fifth Amendment rights by commenting on his failure to call William Coates as a witness. The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify, but "[t]he prosecutor may comment on the defendant's failure to present exculpatory evidence, provided that the comments do not call attention to the defendant's own failure to testify." Mares, 940 F.2d at 461. A "comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the ... Fifth Amendment privilege." U.S. v. Castillo, 866 F.2d 1071, 1083 (9th Cir.1988). The prosecutor did not comment on Thompson's failure to testify. Moreover, the court immediately admonished the jury that "there's no duty, no obligation to any defendant to produce any witness or ... any evidence," and told it to disregard the prosecutor's remark.[3]
 
 B. Vouching
 
 13
 The prosecutor did not impermissibly vouch for Wayne Pederson's credibility. The prosecutor questioned Hartmann about his conversation with Thompson and referred to this conversation in closing argument to strengthen the inference that Pederson was telling the truth, but did not suggest any inference from facts not in evidence or otherwise vouch for Pederson's credibility.
 
 
 14
 We also reject the argument that the prosecutor impermissibly suggested Thompson was guilty merely because he associated with Pederson. The prosecutor's statement that, "[a]n honest man would not go into business with someone like Pederson," was simply part of the prosecutor's justification for introducing evidence of Thompson's involvement with Schoolhouse.
 
 C. Failure to Disclose Perjury
 
 15
 The government did not violate Thompson's rights under Brady v. Maryland, 373 U.S. 83 (1963) by not disclosing Pederson's false testimony until ten months after the trial. Brady requires the government to disclose exculpatory evidence to the defense only if it is "material." U.S. v. Agurs, 427 U.S. 97, 105-06 (1976). "Evidence is material under Brady only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." U.S. v. Kennedy, 890 F.2d 1056, 1058-59 (9th Cir.1989). The jury's knowledge that Pederson lied about the number of aliases he used would not have affected the verdict. Although Pederson's testimony was important and the information undermined his credibility, U.S. v. Shaffer, 789 F.2d 682, 689 (9th Cir.1986) (evidence material if it can "affect[ ] the credibility of a government witness"), Pederson was extensively impeached at trial. The jury already knew Pederson had been convicted of four counts of mail fraud in connection with the Schoolhouse Coins operation and of multiple other felonies, including embezzlement and conspiracy to commit forgery. The government admitted to the jury that Pederson was dishonest and should not be believed absent corroboration. Pederson admitted he had been involved in fraudulent conduct resulting in losses of over $75,000 and that he was testifying pursuant to an agreement with the government under which he hoped to obtain a more lenient sentence. Knowledge of the additional false testimony would not have affected the jury's assessment of his credibility.
 
 IV. JUDICIAL BIAS
 
 16
 A. Assistance in Examining Government Witnesses
 
 
 17
 The district court displayed no bias by questioning the prosecution's witnesses and suggesting how the prosecutor could ask questions to avoid defense objections. "A federal judge has broad discretion in supervising trials, and his or her behavior during trial justifies reversal only if it abuses that discretion." U.S. v. Laurins, 857 F.2d 529, 537 (9th Cir.1988). "A judge's participation justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." Id. Finally, the defendant must show he was prejudiced by the judge's conduct. U.S. v. Milner, 962 F.2d 908, 912 (9th Cir.1992).
 
 
 18
 The court's instructions to the prosecutor to rephrase a question did not imply that defense counsel's objection to the prosecution's line of questioning was inappropriate.[4] The court's suggestion to Pederson as to how to answer a challenge to his credibility reflected no more than dissatisfaction with the form of defense counsel's questions and a desire to expedite examination of the witness. Finally, the court's questioning of a government witness regarding the source of his information was well within the court's discretion; none of the court's questions was improper. Laurins, 857 F.2d at 537 (reversal not required where district judge interrupted prosecutor to "assist" him in conducting trial at least 60 times but provided similar "assistance" to defense counsel only 16 times).[5]
 
 B. Failure to Entertain Defense Objections
 
 19
 The district court did not err in failing to promptly rule on defense counsel's objections to the prosecution's examination of witnesses or conduct sidebar conferences. The district court's question to the witness, "What did [Thompson] say?" conveyed to defense counsel and the jury that the objection was well taken. The district court held at least one sidebar conference and Thompson made no showing that the failure to hold others prejudiced his defense.
 
 C. Criticism of the Prosecutor
 
 20
 The defense has no basis for objecting to the court's criticisms of the prosecutor for "grinning and smirking and laughing" during the proceedings. The criticisms undermined the prosecutor's--not defense counsel's--credibility. Milner, 962 F.2d at 912 (judge's criticism of prosecutor for "pounding" a line of questioning and characterization of prosecutor's cross-examination as "idiotic" was detrimental to the government).
 
 
 21
 Finally, any prejudice the district court's participation during the trial might have caused was minimized by repeated instructions to the jury that it should not construe his remarks as opinions on the merits of the case. Milner, 962 F.2d at 912 (similarly worded curative instructions sufficient to minimize potential prejudice).
 
 
 22
 V. NEW TRIAL MOTION BASED ON PERJURED TESTIMONY
 
 
 23
 The district court did not err in denying Thompson's motion for an order indicating its willingness to entertain a motion for a new trial on the ground that Pederson testified falsely at trial. The denial of a motion for a new trial under Fed.R.Crim.P. 33 will be affirmed unless the defendant shows the newly discovered evidence "will probably produce an acquittal." U.S. v. Davis, 960 F.2d 820, 825 (9th Cir.1992). A new trial was properly denied for the same reasons Thompson's Brady claim fails--the jury already knew Pederson was dishonest, and revealing one more lie would not have affected the weight it gave his testimony. Further, the jury heard substantial evidence of the fraudulent nature of BNGA, including the testimony of Goldberg and BNGA victims.
 
 
 24
 AFFIRMED.
 
 
 
 *
 Honorable James M. Fitzgerald, Senior Judge, United States District Court for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or for the courts of this circuit except as provided by 9th Cir.R. 36-3. The parties are familiar with the facts and issues, and we will not repeat them
 
 
 [1]
 We reject Thompson's argument that the check does not show his connection with the scheme because it was never traced to BNGA's successor company from which the telephone calls alleged in counts 18 through 20 were made. Thompson does not dispute that the activities of the successor company were in furtherance of the same fraudulent scheme Goldberg and Lothian began or that the check represented proceeds from that scheme
 
 
 [2]
 We reject Thompson's argument that it was an abuse of discretion to admit the evidence because presentation of the evidence "consumed too much time." Consumption of trial time is an issue left to the discretion of the trial court. Thompson offers no authority that would justify overturning the district court's judgment
 
 
 [3]
 In light of the district court's admonition that the defense had no duty to present evidence and repeated instruction that the burden of proof was on the prosecutor, we also reject Thompson's argument that the prosecutor's statement impermissibly shifted the burden of proof to the defense
 
 
 [4]
 Any appearance of bias was cured by the court's instruction to the jury that, "you should not show prejudice against an attorney or his client because the attorney has made objections."
 
 
 [5]
 Thompson cites without any discussion several additional instances where the district court questioned the government's witness in response to defense counsel's objections. Nothing in the court's questioning of the witnesses conveyed bias in favor of the prosecution. If anything, the court's actions suggest it was dissatisfied with the way in which the prosecution was examining its witnesses. Laurins, 857 F.2d at 537 (no bias where the district court's interruptions showed "exasperation" with the prosecutor's methods)