Donald Lee CRAIG, Petitioner–Appellant,

v.

Harry K. SINGLETARY, Secretary Department of Corrections, State of Florida, Robert A. Butterworth, Attorney General, Attorney General of the State of Florida, Respondents–Appellees.

No. 93–5123.

United States Court of Appeals, Eleventh Circuit.

Nov. 7, 1997.

Paul M. Rashkind, Asst. Federal Public Defender, Miami, FL, for Petitioner–Appellant.

Robert Butterworth, Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, Consuelo S. Maingot, Miami, FL, for Respondents–Appellees.

Before HATCHETT, Chief Judge, TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge [*].

CARNES, Circuit Judge:

This case involves issues of probable cause and custody for Fourth Amendment purposes. In reversing the district court's denial of 28 U.S.C. § 2254 relief, the panel issued two opinions. Its initial opinion held that the confession of a co-defendant implicating himself and the defendant in a crime does not provide probable cause to arrest the defendant. *See Craig v. Singletary,* 80 F.3d 1509, 1512 (11th Cir.1996). On rehearing, the panel issued another opinion which did not supersede but instead was designed to "supplement and clarify" its prior holding. *See Craig v. Singletary,* 97 F.3d 445 (11th Cir. 1996) (on rehearing). In that supplemental opinion, the panel held that Donald Craig, the habeas petitioner, had been in custody as soon as he arrived at the police station. *See id. But see,* 80 F.3d at 1510–13.

We granted rehearing en banc. *See Craig v. Singletary,* 101 F.3d 98 (1996). For the reasons discussed hereafter, we affirm the district court's denial of relief.

## I. THE HISTORICAL FACTS

Craig filed a pretrial motion to suppress the confessions that he made, and the state

[*] Senior U.S. Circuit Judge John C. Godbold elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

trial court conducted a lengthy evidentiary hearing during which it heard testimony from a number of witnesses, including Craig and all of the law enforcement officers who were involved in questioning him. At the end of the evidentiary hearing the judge made factfindings, one of which was that the law enforcement officers were credible and had testified truthfully while Craig had not. In this habeas proceeding, the United States magistrate judge also made factfindings, which were adopted by the district court. The following recitation of facts is drawn from the record of the motion to suppress hearing, based upon the state trial court's presumptively correct findings, which we have found to be fairly supported by the record, see, e.g., Marshall v. Lonberger, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), and upon the district court's findings, which we have found not to be clearly erroneous, see, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

On the evening of October 25, 1988, while Junior Richards was sitting in his automobile with his girlfriend, Laverne Bailey, two men approached and began to rob him. Richards resisted. One of the men shot Richards in the abdomen, killing him. The crime took place in Gwen Cherry Park in Miami, Florida on October 25, 1988.

On November 9, 1988, Detective Nelson of the Metro–Dade County Police Department received an anonymous phone call. The caller said he knew Detective Nelson had been around the neighborhood asking questions about crimes in that area, and he wanted Nelson to know that Donald Craig and Henry Lee Newsome were the two men involved in the robbery-murder at Gwen Cherry Park a week or two before. That day, Detectives Nelson and Singer went to find Craig. Around noon, they found him at the residence of the Newsome family. However, when they asked who he was, Craig told them his name was Maurice Oliver. After they showed Craig a photograph of himself, he admitted his true identity. Craig told the two detectives he had given them a phony name because he had been deeply involved with some long-term narcotics investigations,

working with their colleague Detective Fandrey.

The detectives told Craig they were investigating a homicide that had occurred at Gwen Cherry Park and thought that he may either have participated or have some pertinent information about it. Craig replied: "You know, I deal with cops all the time, whatever you need, I'll help you with, I didn't see anybody, but I'll tell you what I do know." Detective Singer replied that the street was not a good place to talk, that his file was at the office, and he asked Craig if he would come down to the police station with the detectives. Craig said he would. He was not handcuffed, restrained in any way, or told anything that would lead him to believe he was under arrest. The detectives specifically told Craig that he was not under arrest. They were in plain clothes driving in an unmarked police car. They got in the front seat of the car, and Craig got in the back seat. Craig voluntarily got into the car. The car did not have a cage in the back, or any other device to prevent the person in the back of the car from getting out. If Craig had gotten out of the car and left, the officers would not have arrested him.

Once they got into the car, the detectives told Craig that although he was not under arrest they wanted to read him his rights. Detective Nelson gave Craig his rights from memory, and later in the trip Detective Singer read Craig his *Miranda* rights from a card. Craig said that he understood his rights and that he was willing to talk to the detectives without having a lawyer present. There was no coercion or promises involved in the waiver, and Craig never invoked his right to counsel or said that he did not want to talk to the detectives.

During the ride to the police station, after he had been read his *Miranda* rights twice, Craig expressed curiosity about what it was all about. Detective Singer told him (falsely) that his fingerprints had been found in the victim's car and asked Craig how he could explain that. Craig responded that the murder victim was a friend of his, that he had seen the victim just prior to the killing, and that he had been in the victim's vehicle just before he was killed. According to Craig,

that was when he would have touched the car and opened the car door, leaving his fingerprints. There followed some conversation about how Craig knew the victim, where they had met, and so forth. Craig also said that he had some other information but suggested they wait until they got to the police station.

On the way to the police station, they stopped and got something to eat at the drive-through window of a McDonald's restaurant. Craig was offered something to eat and drink at the drive-through window, and he may have actually gotten something. In any event, Craig was free to get out of the car and go at any time.

At the police station, they went to the robbery office where they again read Craig his *Miranda* rights, this time from a form. Craig did not hesitate to sign the form, he did not ask for an attorney or invoke his right to remain silent, and "as a matter of fact he was very relaxed." After Craig signed that *Miranda* rights form at 12:31 p.m., the detectives took a photograph of him, and then they all went down to the homicide office, which is in the same building.

At the homicide office, Detective Singer and Craig talked. Craig told Detective Singer that he was very familiar with the system, wanted to help, and was going to tell them everything he could. Detective Singer asked Craig to tell him what he knew about the crime. Craig replied that he had known the victim for three or four months and that on the night of the shooting, before it occurred, the victim had driven up to Craig, who was standing on a corner. They had had a conversation. Craig had gotten in the driver's seat of the car, which would explain his fingerprints. They smoked some marijuana together, and the victim told Craig he was going to pick up his girlfriend. Craig also told Detective Singer that later that night he had heard a gunshot and had seen Henry Lee Newsome along with Rodney Newsome running from the area where the shot had been fired, near Gwen Cherry Park, and Rodney Newsome appeared to be carrying a sawed-off shotgun.

Detective Singer told Craig that his story just did not jive. Craig responded by saying that if the detective had any problem with what Craig was saying, "[L]et me take a polygraph test." Even though Detective Singer did not believe Craig's story, Craig was not told he was under arrest; he was not told he couldn't leave; and he was not handcuffed or restrained in any way. Craig was free to leave, and if he had said he wanted to go, he would have been allowed to do so. Craig never said he wanted to leave.

After Craig volunteered to take a polygraph examination, Detective Singer went and spoke with Detective Mote about giving one to Craig. Detective Singer filled in Detective Mote about what had happened, including what Craig had told him. Detective Singer wanted Mote to see if the information which Craig had given him was truthful. After Detective Singer had talked with Mote, Singer showed Craig where the polygraph examination room was. It, like the homicide office, is on the second floor of the building.

Detective Mote is the one who gave Craig the polygraph examinations, and Craig came into his office around 3:00 p.m. Detective Mote treats people differently if they are under arrest: he does not let them leave his office without being with him or with some other detective. However, when Craig came to Detective Mote's office, Mote understood that Craig was free to leave at any time. He was not in handcuffs or restrained in any way. In Detective Mote's office, Craig signed two forms. One was a *Miranda* warning form, which Craig signed in Detective Mote's presence at 3:10 p.m. Craig did not ask for an attorney. The other form Craig signed in Detective Mote's office was a standard polygraph examination consent and release waiver.

Detective Mote reinterviewed Craig about what had happened, and then he administered polygraph examinations to Craig based on the questions Mote had developed. There were two polygraph examinations.

In between the two polygraph examinations, they took a break around 5:00 p.m. Detective Mote told Craig he could go use the restroom, get a drink of water, or have a cigarette. Craig went to another office and sat in the hallway area. He was unescorted.

No one was guarding him. When asked if Craig was free to leave, Detective Mote testified: "No problem, free to go." Craig was gone from the polygraph room and on his own for fifteen to twenty minutes. Neither Mote nor any other officer checked on Craig during that period of time. When Detective Mote next saw him, Craig was in the hallway by the elevator. Craig came back for the second polygraph examination, which took about half an hour. That final polygraph examination ended at 5:40 p.m.

During the approximately two-and-one-half hours it took to prepare for and administer the polygraph examinations to Craig, Henry Lee Newsome was located. Detective Nelson found Newsome, who agreed to come to the police station. Detective Singer included a photograph of Newsome in a group of photographs he showed to Laverne Bailey, the victim's girlfriend who had witnessed the killing. Ms. Bailey picked out the photograph of Newsome as one of the two men involved in the robbery-murder. Also included in the photographs shown to her was one of Craig, but she could not make an identification of him from that group of photographs, and "said she would rather see the person." It was around 4:30 p.m. or so when Detective Singer showed the photographic lineup to Ms. Bailey.

After leaving Laverne Bailey, Detective Singer returned to the homicide office where Henry Lee Newsome was being questioned. At approximately 5:30 p.m., Newsome confessed and implicated Craig. Newsome said that he and Craig had gone to an area where Junior Richards and Laverne Bailey were in the car talking or necking, and that the crime had been Craig's idea. Craig had the shotgun, and he pointed it and ordered Richards out. Richards was then beaten. When Craig started to drive away with Richards' car, Richards tried to stop him and Craig fired the shotgun, killing Richards. Henry Lee Newsome's confession was consistent with Laverne Bailey's description of the crime.

After the second polygraph examination was completed at 5:40 p.m., Detective Mote told Craig that the examinations indicated he had been deceptive. Craig did not respond.

Detective Mote testified that even then Craig was not under arrest, and nothing was said to Craig that indicated he was under arrest.

Thereafter, at approximately 6:00 p.m., Detective Mote told Singer that the polygraph examinations showed Craig had been deceptive on the pertinent questions. However, Detective Mote told Singer that as far as Mote was concerned Craig still was not under arrest and was free to leave at any time. In Singer's words, Craig "had the run of the building," and "went to the bathroom and sat by the elevators for awhile." Detective Singer did not place Craig under arrest. He had not spoken to Craig since the polygraph examinations had been completed, and he did not indicate in any way that Craig was no longer free to leave. Craig did not ask to leave, but if he had Detective Singer would have allowed him to go.

At some point, Detective Singer told Craig that the polygraph examiner (Detective Mote) had said he thought Craig was being deceptive. Craig asked to speak with Detective Fandrey. Craig had been Detective Fandrey's confidential informant for four or five years, and they had a working relationship. He had helped Fandrey in narcotics cases, a lot of them. Craig's help had led to the prosecution of between 120 and 130 cases. Detective Singer told Craig he would try to find Fandrey.

If Craig had asked to leave so that he could go and find Fandrey himself, Detective Singer would have allowed him to go. While Singer was trying to find Detective Fandrey, who was not in the building, Craig sat in an office with the door open. The door was never locked, and Craig was not handcuffed. Singer did not ask anything other than to talk to Detective Fandrey, who was finally located about 7:00 p.m. Detective Fandrey came to the station, and Detective Singer briefed him on the information they had linking Craig to the crime. Detective Fandrey then went into the office where Craig was, and he closed the door so they could have some privacy.

After entering the room, Fandrey asked Craig what was going on. Craig replied: "Some bad shit." Shortly after Detective

Fandrey started talking to him, Craig asked for cigarettes and a sandwich, and Fandrey got Detective Singer to go get some. The food and cigarettes were brought to Craig ten or fifteen minutes later. Craig ate the food while Detective Fandrey and he talked.

Detective Fandrey and Craig talked for between an hour and an hour and fifteen minutes. The majority of that time was spent talking about cases they had worked together in the past, particularly a federal case that was still pending. They spent very little time discussing the homicide itself. In the past Detective Fandrey had helped Craig by getting assistant state attorneys to reduce charges or sentences after Craig had been arrested for burglary, grand theft, and crimes of that nature. Detective Fandrey had done that because Craig helped him with narcotics cases. Detective Fandrey told Craig that he did not know what was going to happen, because this crime was not anything like the burglaries and thefts he had helped Craig avoid punishment for in the past. Craig did not say much to Detective Fandrey about the crime. The only statements Craig made to Fandrey about the crime were: "I really messed up. I really messed up. All I wanted to do was rip the guy."

Toward the end of their conversation, Craig told Detective Fandrey that after Detective Singer had informed him of what they had against him, Craig had "shrugged his shoulders and made the comment to Singer that 'if you have that against me you might as well get me a lawyer.'" Craig never told Detective Fandrey he wanted the questioning to stop or that he wanted an attorney, but he did tell Detective Fandrey about the statement concerning an attorney he claimed to have made to Detective Singer. That was the only time Craig ever mentioned the word "lawyer" or "attorney" to Detective Fandrey that day. Neither Detective Singer nor any other officer ever told Fandrey anything suggesting that Craig had asked for a lawyer. Detective Fandrey testified that he did not believe Craig had made the statement concerning a lawyer to Detective Singer. Craig's demeanor, and particularly the shifting of his eyes away from eye contact with Detective Fandrey, convinced Fandrey that Craig was lying: "I have known Donald for four, almost five years, and I know when Donald is pulling the wool over my eyes, bullshitting me, and I knew he was feeding me a line of bull." Detective Fandrey did not tell anyone that Craig had said anything about a lawyer.

Eventually, Detective Fandrey left the room where he and Craig had been talking in order to get Detective Singer. Singer and Fandrey later went back to talk with Craig. Detective Singer started talking to Craig about the facts of the case, and within a couple of minutes Detective Fandrey left the room. Detective Singer told Craig that what he had been telling him did not make sense, that there had to be more. At that point Craig, who was "crying a little bit and seemed somewhat upset," proceeded to tell Detective Singer that he had been involved, that he was sorry he was involved, but that he did not shoot the victim. Craig said that he was not responsible for actually pulling the trigger, "and went on to say that the gun was over his lap, but that Henry Lee Newsome was in the passenger seat and he had control of the trigger and he was the one who actually fired the weapon." Craig made that oral confession to Detective Singer sometime between 7:00 p.m. and 8:00 p.m. While Craig and Singer were in the room together on that occasion, Craig did not ask for a lawyer, nor did he indicate that he wanted to invoke his right to silence.

After Craig had given that oral confession, which was his third version of the events, Detective Singer took Craig into a room where the stenographers were, showed him the *Miranda* form Craig had signed earlier, and went through those rights with him again. Craig did not ask for a lawyer, but instead agreed to talk without the presence of one. He did not invoke his right to silence. He wanted to talk. Craig seemed relieved after he gave his statement admitting participation in the crime.

In his stenographic statement, which followed the oral one, Craig confessed to participating in the robbery and murder of Junior Richards, but said that he was not the actual shooter. Craig's stenographic statement was

finished and typed up at approximately 9:50 p.m.

Detective Singer then began the process of preparing arrest affidavits, taking care of the paperwork, and generally dealing with the case involving Newsome and Craig. At approximately 11:30 or 11:45 p.m., there was a knock on the door of the interview room where Detective Singer was. It was Craig, saying that he wanted to talk to Detective Singer. Singer asked Craig what he wanted. Craig told him that he had heard Newsome's voice in the office and realized that Newsome was there and would tell the detectives what really happened, so Craig wanted to let them know that it was he, Craig, who was in fact responsible for shooting the victim. Craig also told Detective Singer the truth was that he had not known the victim.

None of what Craig had said to Detective Singer on that late night occasion was promoted by questioning; it was purely extemporaneous and unsolicited. Before Craig knocked on the door, Detective Singer had no idea that Craig was going to make another statement, and Singer was making arrangements to transport him to jail. Detective Singer did nothing to encourage Craig to talk with him again: "[H]e just opened the door and asked to talk to me."

After Craig had made the late-night oral confession to Detective Singer, Singer arranged to have that version of events taken down stenographically. It was. In this second stenographic statement, Craig admitted participating in the robbery and being the one who shot Junior Richards. This second written confession is referred to in some of the state and federal proceedings involving this case as "the addendum confession."

## II. PROCEDURAL FACTS

### A. The State Trial Court

In the state trial court, Craig filed a pretrial motion to suppress all of his statements and confessions. After hearing all the evidence and the arguments of counsel, the court denied the motion to suppress. It found that the statements were voluntary and that Craig's testimony to the contrary was not credible. The court specifically found that Detective Fandrey's testimony was credible and that Craig had not requested counsel, even equivocally. Crediting the testimony of Detectives Fandrey and Singer, the court concluded that Craig was not in custody until he gave the first stenographic statement; before then, he was free to go. The court also found that there was probable cause to arrest Craig at least as of the time of the polygraph examinations, which had come before the first stenographic statement.

### B. The State Appellate Court

The only issue Craig raised on direct appeal concerned the admissibility of the statements he had made to the detectives. *See Craig v. State*, 599 So.2d 170 (Fla.Dist.Ct. App.1992). For purposes of deciding the appeal, the Florida appellate court assumed arguendo that Craig's initial oral and stenographic statements should not have been admitted because of an at least equivocal invocation of his desire for counsel. *See id.* at 170–71. The court went on to hold, however, that any such error was rendered harmless by Craig's subsequent oral and stenographic statements admitting that he was the actual shooter. Craig's later confession "was essentially volunteered when, some two hours after the questioning had terminated, Craig himself re-established contact with the police for the very purpose of admitting his guilt." *Id.* at 171. The court described the pertinent facts as follows:

> Craig was placed in a room in the police station awaiting transportation to the jail. While there, he overheard his co-defendant, who was being questioned in the next room, "throw him in" to the police. For that reason, he decided, for his own best interests, to confess his involvement. He then literally knocked on the door of the interview room, told Singer he wanted to confess and did so. There is no indication whatever that the confession arose out of a deliberate stratagem or any form of improper "interrogation by the police." Indeed, they were totally surprised by the confession.

*Id.* at 171 (citations omitted). The court held that Craig's "reinitiation of the process cured any previous Fifth Amendment defect and

rendered the decisive admission constitutionally permissible" under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

### C. The Federal District Court

After the Florida Supreme Court denied review, 605 So.2d 1263 (Fla.1992), Craig filed in the United States District Court a 28 U.S.C. § 2254 petition seeking federal habeas corpus relief. That petition was referred to United States Magistrate Judge Charlene H. Sorrentino. Her report was adopted in its entirety by the district court, so we will treat it as the order of the district court.

The three grounds for relief that Craig asserted in the district court were as follows:

1. The trial court erred in admitting the petitioner's initial confession and "addendum confession," and the admission of these statements was not harmless error in light of the paucity of other state's evidence.

2. The petitioner's equivocal invocation of his desire to obtain counsel which [the] police failed to clarify or acknowledge, rendered all subsequent confessions, especially the "addendum confession," inadmissible.

3. The trial court erred in denying the petitioner's motion to suppress his initial and addendum confessions, where they were the product of an illegal arrest made without probable cause.

After setting out some of the relevant facts, the district court explained why it was rejecting each of the asserted grounds for relief.

The court first rejected Craig's contention that he was entitled to relief because the introduction of his earlier confession, the stenographic version of which had been completed about 9:50 p.m., violated *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because it had resulted from interrogation that occurred after he invoked his right to counsel. Like the Florida appellate court, the district court held that any *Edwards* error in the admission of that first confession was rendered harmless by admission of the second or "addendum confession," which resulted not from any police-initiated communication but instead from

Craig approaching the police officers at approximately 11:30 p.m. wanting to talk further with them.

The district court reasoned that even if the first confession was inadmissible under *Edwards,* the second or "addendum confession" was not. The *Edwards* decision expressly held that if a defendant who has previously invoked his right to counsel later reinitiates conversation with police officers and volunteers statements to them, those statements are admissible. *See* 451 U.S. at 485–86, 101 S.Ct. at 1885–86. That was precisely what had occurred in this case, the district court said, because Craig "voluntarily, and completely of his own volition, reinitiated contact with the police officers" and "without being questioned, spontaneously blurted out the inculpatory 'addendum confession' that he had lied and that it was he who had shot the victim." Admission of the earlier confession was rendered harmless, because it was merely cumulative to the later valid confession.

Next, the district court rejected Craig's contention that his first confession was the product of an illegal arrest which tainted his second or addendum confession. The court explained that Craig was not under arrest until after he gave his initial confession, which therefore could not have been the product of an illegal arrest. The first confession was not involuntary, so there was no carryover taint from it to affect the admissibility of the second confession.

Nor was the second confession itself coerced. Instead, as the court explained: "After giving his initial statement that he was not the gunman, Craig simply took two hours to reflect and, of his own volition, took it upon himself to seek out the police and blurt out his confession." In that two-hour period, there was no interrogation and no interaction between Craig and the police.

The district court denied Craig's habeas petition, and he appealed.

### D. The First Panel Opinion

A panel of this Court reversed the district court's denial of habeas relief, issuing two opinions, *Craig v. Singletary,* 80 F.3d 1509 (11th Cir.), *extended on rehearing,* 97 F.3d

**1038**

445 (1996). In its first opinion, the panel held that Craig's first confession was inadmissible under *Edwards*, because the statement "well if you have that against me you might as well get me a lawyer" was an unequivocal request for counsel within the meaning of *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). *See* 80 F.3d at 1511–12.

As for the second or addendum confession, the panel did not hold that there was any *Edwards* error in regard to it. Instead, the panel held the second confession was inadmissible because it was the product of an illegal arrest, i.e., one not supported by probable cause. *See* 80 F.3d at 1512–13. That holding concerning the lack of probable cause relied upon two essential premises. The first premise was that Craig's initial confession, which undoubtedly established probable cause, could not be considered for that purpose, because it was the product of an *Edwards* violation. *See id.* at 1512. The second premise, equally essential to the conclusion, was that without the initial confession the police lacked probable cause to arrest Craig when they did. The panel specifically held that co-defendant Newsome's confession that he and Craig had committed the crime was insufficient to establish probable cause as to Craig. *See id.*

Craig was arrested, according to the first panel opinion, after he had finished giving the formal written (stenographic) version of his first confession at 9:50 p.m. *See id.* at 1511 ("Craig gave a formal written statement which concluded at about 9:50 p.m. Craig was placed under arrest . . . ."); *id.* at 1511, 1513 (the addendum or second confession occurred at about 11:30 p.m., which was "approximately two hours after the illegal arrest"). Since the panel believed there was no probable cause to arrest Craig before he gave his first confession, which could not be considered for probable cause purposes because of the *Edwards* violation, the arrest following that first confession was also without probable cause, in its view. *See id.* at 1512–13.

The panel then applied *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), to decide whether the illegality of the arrest at 9:50 p.m. rendered the second confession, which occurred approximately two hours later, inadmissible as the product of an illegal arrest. Although the detectives did not engage in flagrant misconduct, in the panel's view, "they had no basis for the arrest," and no intervening circumstances dissipated the effect of the illegal arrest. *See id.* at 1513.

Unable to say that erroneous admission of both confessions was harmless error, the panel directed the district court to grant the writ conditioned on the right of the State to retry Craig. *See id.*

### E. The Second Panel Opinion

In denying the State's petition for rehearing, the panel issued another opinion in order to "supplement and clarify our holding on the validity of Craig's arrest." *See* 97 F.3d 445. The panel's second opinion stated: "It is clear to us that Craig was in custody at the police station if not earlier in the car." *See id.* at 445. We granted rehearing, 101 F.3d 98, vacating both panel opinions.

### III. ANALYSIS

We begin our analysis with a discussion in Part III.A of the *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), issue. We explain in that part why even if there was an *Edwards* violation as to Craig's first confession, the error in admitting that confession was rendered harmless by admission of Craig's second confession which is free of any *Edwards* problem. Part III.B contains our discussion of whether Craig's second confession was the product of an illegal arrest. As we explain in subpart 1 of that part, Craig was not in custody and arrested until sometime after the second polygraph was completed at 5:40 p.m. In subpart 2, we explain why Henry Lee Newsome's confession at 5:30 p.m. supplied sufficient probable cause to arrest Craig. Because probable cause preceded the arrest, we conclude that Craig's second confession was not the product of an illegal arrest.

## A. The *Edwards v. Arizona* Issue

Sometime during their conversation, which began after 7:00 p.m., Craig told Detective Fandrey that earlier in the day he had made this statement to Detective Singer: "If you have that against me you might as well get me a lawyer." Detective Fandrey did not believe Craig had made that statement to Detective Singer, and neither did the state trial judge who heard the conflicting testimony about it. Detective Singer testified that Craig did not request an attorney. Craig testified that he did, but the judge who heard the conflicting testimony did not believe Craig. The judge credited Detective Fandrey's testimony that Craig had lied when he told Fandrey that he had made the statement about an attorney to Detective Singer.

The panel held that Craig's telling Detective Fandrey he had made the statement to Detective Singer—apparently even if he had not actually made that statement to Singer—was an invocation of the right to counsel. *See* 80 F.3d at 1511–12. In the panel's view, because Detective Fandrey and later Singer continued questioning Craig, the resulting first confession should have been suppressed under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ Only unequivocal requests for counsel require officers to cease questioning a suspect. *See Davis v. United States*, 512 U.S. 452, 461–62, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."); *see also Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994) (holding that *Davis* modified our prior rule that an equivocal or ambiguous reference to counsel prohibited further questioning except to clarify whether the suspect wanted counsel). The panel thought a suspect falsely telling a detective that he had previously told another detective "if you have that against me you might as well get me a lawyer," was an unequivocal request for counsel. 80 F.3d at 1512. We have our doubts. *See United States v. Mikell*, 102 F.3d 470, 476–77 (11th Cir.1996) (silence in response to certain question not an unequivocal assertion of right to remain silent); *Davis v. United States*, 512 U.S. at 462, 114 S.Ct. at 2357 ("Maybe I should talk to a lawyer" not an unequivocal request for counsel); *Coleman v. Singletary*, 30 F.3d at 1422–23 ("I don't know. But if [the lawyer] said to stop it I don't want to do what he said not to do" not an unequivocal assertion of the right to remain silent); *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1472 (11th Cir.1992) ("I don't know if I need a lawyer, maybe I should have one, but I don't know if it would do me any good at this point" not an unequivocal request for counsel).

■ We need not resolve those doubts one way or the other. For reasons that will become apparent, our disposition of this case remains the same regardless of whether Craig's first confession was taken in violation of the *Edwards* rule. Accordingly, we assume without deciding that Craig's statement to Detective Fandrey about what he claimed to have told Detective Singer was an unequivocal assertion of the right to counsel, so that Craig's first confession (both the oral and written versions of it) was admitted in violation of the *Edwards* rule.

Nonetheless, Craig is not entitled to relief from his conviction. We begin with the unassailable proposition that admission of Craig's second or addendum confession did not violate the *Edwards* rule. We describe that proposition as "unassailable," because the Supreme Court in *Edwards* spoke directly to this situation, stating: "Had Edwards initiated the meeting [where he made the statements at issue], nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary statements and using them against him at the trial." 451 U.S. at 485–86, 101 S.Ct. at 1885–86. *Accord, e.g., Minnick v. Mississippi*, 498 U.S. 146, 155, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990) ("Edwards does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities"); *Bassett v. Singletary*, 105 F.3d 1385, 1387 (11th Cir.1997) (no *Edwards* violation where suspect, who had invoked right to counsel, reinitiated discussions by asking as officers were leaving the room: "Well what

do you want, anyway?"); *Henderson v. Dugger*, 925 F.2d 1309, 1313 (11th Cir.1991) ("Henderson's prior request for counsel is irrelevant as long as he initiated the confession."); *United States v. Valdez*, 880 F.2d 1230, 1232–34 (11th Cir.1989) (no *Edwards* violation where suspect who had previously invoked right to counsel asked in car on way to jail "Where are we going?" and officer's response led to incriminating statement). That is precisely what happened in this case.

Even assuming *Edwards* error in admission of Craig's first confession, the effect of it must be judged in light of admission into evidence of the second or addendum confession for which there is no *Edwards* problem. The difference between the two confessions is that in the first one Craig admitted participation in the robbery but denied that he shot the victim, while in the second confession Craig finally admitted he was the shooter. The second confession was more harmful to Craig than the first, because the second one incorporated all that was incriminating from the first and added something worse.

For that reason, the Florida appellate court held that any error in admission of the first confession was harmless. *See Craig v. State*, 599 So.2d 170, 171 (Fla.Dist.Ct.App. 1992) ("Any such error was, however, rendered harmless by a subsequent statement in which he admitted that he was the actual shooter."). The district court agreed. So do we. In this habeas proceeding we apply "a less onerous standard" of harmless constitutional error than the harmless beyond a reasonable doubt standard that is employed on direct review. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). The applicable standard in habeas proceedings is whether, in light of the record as a whole, the constitutional error "had substantial or injurious effect or influence in determining the jury's verdict." *Id.* at 637–38, 113 S.Ct. at 1721–22 (citation and internal quotation marks omitted). Because the second or addendum confession overlapped the first and went even further to Craig's detriment than the first one did, any error in admitting the first confession did not have a substantial and injurious effect or influence in determining the jury's verdict.

## B. The Legality of the Arrest

In addition to holding that the first confession was marred by *Edwards* error, the panel also held that the second or addendum confession was the product of an illegal arrest, i.e., Craig was arrested before probable cause existed to believe that he had committed any crime. *See* 80 F.3d at 1512–13, 97 F.3d at 445–46. Our analysis leads us to a different conclusion.

Deciding whether probable cause existed to support an arrest involves pegging two events temporally: the time of the arrest, and the time probable cause to arrest existed. We begin by determining when Craig was under arrest.

1. Craig Was Not Arrested Until Sometime After the Second Polygraph Examination Was Completed at 5:40 p.m.

■ The state trial judge, after conducting a full evidentiary hearing into the matter, held that Craig was not in custody until after he gave his first confession. The district court, after reviewing the record, agreed: "Craig was not under arrest, however, until after he gave the initial confession. . . ." The panel agreed, as well, at least initially.

In its first opinion, the panel held that Craig had not been arrested until after he had given the stenographic version of his first confession, at approximately 9:50 p.m. *See* 80 F.3d at 1510 (after the two polygraph examinations were concluded "Craig was not placed under arrest but was escorted to the lieutenant's office at about 6:00 p.m."); *id.* ("At about 5:30 p.m. Henry Lee [Newsome] confessed and stated that Craig shot Richards," and "two hours after Craig heard Newsome implicate him, Craig, still not under arrest, asked to speak to Detective Fandry . . . ."); *id.* at 1511 ("Without requesting a lawyer Craig gave a formal written statement which concluded at about 9:50 p.m. Craig was placed under arrest . . . ."); *id.* at 1511, 1513 (the addendum confession began at 11:30 p.m., and "[t]he addendum confession occurred approximately two hours after the illegal arrest."). In its second opinion,

the panel changed its mind, and held: "It is clear to us that Craig was in custody at the police station, if not earlier in the car." 97 F.3d at 445.

We think the state trial judge, the district court, and the first panel opinion are correct: Craig was not in custody until after he confessed the first time. However, it is not necessary for us to rest our decision on a holding that Craig was not in custody until after he first confessed—orally around 8:00 p.m., with the stenographic version being completed around 9:50 p.m. Instead, for reasons that will become apparent in our discussion of probable cause, it is enough to dispose of this case if Craig was not in custody until after Henry Lee Newsome confessed implicating Craig, which occurred at 5:30 p.m.

With certain exceptions not relevant here, see, e.g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an arrest for Fourth Amendment purposes is a seizure. See Dunaway v. New York, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). A person is seized, arrested, or in custody "only when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Only when freedom of movement is restrained by authority—only when a seizure occurs—does the Fourth Amendment and the probable cause requirement apply. See id.

The applicable test manifestly is not a subjective one. Instead, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id.; accord, e.g., Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) ("Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment."). Thus the suspect's subjective views are not determinative. Nor are the subjective views of the law enforcement officers who are present relevant, except to the extent they were communicated to the suspect at the time. See United States v. Mendenhall, 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6, 64 L.Ed.2d 497.

Applying this objective test to the totality of the circumstances in this case, we conclude that a reasonable person in Craig's situation would have believed he was free to leave at least up through the time Newsome confessed at 5:30 p.m. (which, as we will discuss later, established probable cause to arrest Craig). Our conclusion follows from the pertinent facts, which we will now summarize.

When the plainclothes detectives in an unmarked car first approached Craig in the neighborhood and told him about the crime they were investigating, Craig volunteered to help them. Explaining that the street was not a good place to talk, they asked him if he would come down to the police station, and Craig agreed to do so. He was not handcuffed or restrained in any way, and he was specifically told he was not under arrest. Craig voluntarily got into the back seat of the car, which was not equipped with any device to prevent him from getting out.

Once in the car, Craig was read his *Miranda* rights for the first of several times that day, but the detectives again told him he was not under arrest. The atmosphere in the car is indicated by the fact that en route to headquarters they went through the takeout window at a McDonald's Restaurant and got something to eat.

Craig never expressed any desire to leave the police station, nor any reluctance to talk. He told the detectives he was familiar with the system, wanted to help, and was going to tell them everything he knew. When Detective Singer told Craig that one of his stories did not "jive," Craig asked to take a polygraph examination, and it was arranged. Craig was not restrained or coerced, and in between the two polygraph examinations he walked freely about the building, going to the restroom, getting a drink, sitting in the hallway—all of which he did unescorted. After wandering around during the fifteen or twenty minute break between the two polygraph examinations, Craig ended up in the hallway

near the elevator. He returned to the polygraph room and took the second examination, which was completed at 5:40 p.m. Even then, although Craig had shown deception during the polygraph examinations, neither the examiner nor anyone else said anything to him that indicated he was under arrest.

In view of all of the facts and circumstances, a reasonable person in Craig's position would not have believed that he was under arrest, i.e., not free to go, until sometime after the second polygraph examination ended at 5:40 p.m. How long after that is irrelevant to the disposition of this case because, as we will explain below, probable cause to arrest Craig existed before that time.

2. Newsome's Confession at 5:30 p.m. Supplied Probable Cause to Arrest Craig

■ Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. *See, e.g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *Hargray v. Hallandale,* 57 F.3d 1560, 1571 (11th Cir.1995); *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir.1989). Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment," *Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 1111, 28 L.Ed.2d 484 (1971), "probable cause itself is a doctrine of reasonable probability and not certainty," *United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.1995); *see also Ortega v. Christian,* 85 F.3d 1521, 1524 (11th Cir.1996) ("Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'"). It "must be judged not with clinical detachment, but with a common sense view to the realities of normal life." *Wilson v. Attaway,* 757 F.2d 1227, 1236 (11th Cir. 1985).

Before applying that standard to the facts of this case, we need to address two preliminary matters. The first arises from the panel's statement that Detective Singer "considered that Newsome's unsworn statement, which implicated Craig, and was given prior to Craig's 'initial confession,' could not of itself have constituted sufficient probable cause for a valid arrest of Craig," 97 F.3d at 446, and the panel's suggestion that a law enforcement officer's subjective belief is somehow relevant to a court's probable cause inquiry, *see id.*; 80 F.3d at 1512.

■ We do not believe the record necessarily establishes that Detective Singer believed Newsome's confession was insufficient to establish probable cause to arrest Craig. Instead, we read his answer to the question of whether Craig was then in custody ("No. I didn't have enough. We are trained not to move too fast.") as consistent with a police practice of not arresting a suspect as soon as probable cause is established if additional questioning might lead to more evidence. More fundamentally and more importantly, the subjective beliefs of Detective Singer are irrelevant to our probable cause analysis. Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been. *See, e.g., Whren v. United States,* 517 U.S. 806, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States,* 517 U.S. 690, —— – ——, ——, 116 S.Ct. 1657, 1661–62, 1663, 134 L.Ed.2d 911 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy,* 869 F.2d 1427, 1433 (11th Cir.1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *United States v. Clark,* 559 F.2d 420, 425 (5th Cir.) ("[E]ven though a police officer believed that probable cause was lacking, the Court still had the duty to objectively determine if probable cause was present."), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *see also Horton v. California,* 496 U.S. 128, 136–40, 110 S.Ct. 2301, 2308–09, 110 L.Ed.2d 112 (1990) ("[E]venhanded law enforcement is best achieved

by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

■ The other preliminary matter we need to address is the panel's statement that, at the motion to suppress hearing, the prosecution took the position that even with Newsome's confession implicating Craig, there was not probable cause to permit an arrest consistent with the Fourth Amendment until Craig himself confessed. The panel suggested that such a prosecutorial position in the state trial court might be controlling here. *See* 97 F.3d at 446, 80 F.3d at 1512. The first panel opinion quotes a little of what one of the two prosecutors said during a colloquy with the trial court at the motion to suppress hearing. *See* 80 F.3d at 1512. However, when her statement is placed in context, it is clear that her position was that once Newsome confessed implicating Craig at 5:30 p.m., which occurred before completion of the second polygraph examination, there was sufficient probable cause to arrest Craig. She referred to probable cause sufficient to justify an arrest under the Fourth Amendment as "technical probable cause," apparently to distinguish it from the greater amount of evidence sought as a policy matter before questioning of a suspect would end, or the amount of evidence that would assure a reasonably high chance of conviction.

The first exchange on this subject was between the trial court judge and Ms. Langer, one of the two prosecutors (not the one whose remark is quoted in the first panel opinion). To fully understand this and another exchange we will quote later, it is necessary to know that the trial judge and parties had previously denominated Craig's own first confession to Detective Sanders as "the third version," and "the third version, the fourth statement" Craig made during the day. That "third version, the fourth statement" of Craig's, which was his first confession, occurred between 7:00 p.m. and 8:00 p.m., which was a couple of hours after Newsome had confessed at 5:30 p.m. Recall also that the second and final polygraph examination ended at 5:40 p.m. So, the chronology is: first Newsome's confession; then the end

of the polygraph examinations; and then Craig's first confession (the "third version, the fourth statement" Craig made during the day). The exchange between the trial court judge and prosecutor Langer, went as follows:

THE COURT: When does the State say that probable cause was achieved?

MS. LANGER: Probable cause is going to be sometime, I think, during the second polygraph.

THE COURT: What do you mean "the second polygraph"?

MS. LANGER: Well, there are two polygraphs. Mote gave two polygraphs and sometime, I believe, around 4:30—

THE COURT: But before the third version of what happened in the presence of Detective Fandrey.

MS. LANGER: Right, the third version, the fourth statement.

THE COURT: The two polygraphs were right after another?

MS. LANGER: The PC comes before that. It is about 4:30 in the afternoon.

THE COURT: Probable cause comes before the—

MS. LANGER: I believe it is during the second. It is at the time during which Mr. Newsome gives the statement.

Thus, the prosecution stated its position to the trial court that probable cause to arrest Craig existed at least by the time Newsome confessed, if not earlier.

After that position had been stated by Ms. Langer, the other prosecutor, Ms. Henghold, then made the statement quoted in the first panel opinion. We put that statement in full context, below. Ms. Henghold, referring to the time of Craig's own first confession (sometime between 7:00 p.m. and 8:00 p.m.), stated:

MS. HENGHOLD: I think I heard what the Judge said.

Probable cause, technical probable cause existed before then.

THE COURT: Is there non-technical probable cause?

MS. HENGHOLD: When you have a loosely knit probable cause, it doesn't give

you the right to make the arrest at that point.

The arrest could not have been made just based upon a co-defendant's statement, obviously.

THE COURT: Do we have probable cause on different levels that would make me make a decision, one way or the other?

MS. HENGHOLD: Judge, what I will say—in any case where a co-defendant has made a statement implicating somebody else, no arrest is made until you have some corroboration.

THE COURT: I don't know. I have tried a lot of murders. Well, some—I don't know about a lot, but I want to talk just about this case.

"Probable"—do you agree probable cause is during the polygraph statement?

MS. HENGHOLD: Yes, but that he is not in custody at that point.

THE COURT: I understand you don't think he is in custody. According to the State he was free to go even though there was probable cause, until his third version.

MS. HENGHOLD: Right.

Again, the "third version" the judge is referring to is Craig's initial confession to Detective Singer, which occurred between 7:00 and 8:00 p.m.

Ms. Henghold's ambiguous remarks muddied the waters, but a fair reading of the transcript as a whole does not support the premise that the prosecutors took the position at the motion to suppress hearing that probable cause did not exist even after Newsome confessed implicating Craig. Instead, viewed in their entirety, the prosecutors' statements reflect a position that at least as soon as Newsome implicated Craig, there was sufficient probable cause for Fourth Amendment purposes—what one of the prosecutors referred to as "technical probable cause"—even though the detectives would not have actually arrested Craig without more evidence. Of course, we are concerned only with constitutional requirements—with "technical probable cause" if you will—not with any local policies or with any strategic decisions of law enforcement officers to withhold an arrest until more evidence is obtained.

Furthermore, even if the two prosecutors had believed at the time of the suppression hearing that Newsome's confession did not establish probable cause to arrest Craig, the subjective beliefs of prosecutors are no more binding on courts than are those of police officers. *See supra* at 1043. It is true that prosecutors, like other attorneys, may make concessions which can bind their clients. But no one representing the State has made any concession in this federal habeas proceeding that Newsome's confession failed to establish probable cause. Moreover, the state trial judge did not interpret the prosecutors' statements to him as such a concession. Instead, that judge, who heard all of the prosecutors' statements as they were made, interpreted them as we do: those statements staked out the State's position that even though he was not arrested until later, probable cause to arrest Craig existed at least by the time Newsome confessed that he and Craig had committed the crime. We turn now to examine that position on its merits.

■ For the past forty years, an unbroken stream of precedent in this circuit has established that the uncorroborated testimony of a co-conspirator or accomplice is sufficient to prove guilt beyond a reasonable doubt. *See United States v. LeQuire*, 943 F.2d 1554, 1562 (11th Cir.1991) ("[U]ncorroborated testimony of an accomplice is sufficient to support a conviction in the Federal Courts if it is not on its face incredible or otherwise insubstantial.") (citations and internal quotation marks omitted), *cert. denied*, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *United States v. Broadwell*, 870 F.2d 594, 601 (11th Cir.) ("Testimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction."), *cert. denied*, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989); *United States v. Stitzer*, 785 F.2d 1506, 1515 (11th Cir.) (noting that "where a conviction is based on the uncorroborated testimony of an accomplice, the testimony must not be incredible or insubstantial on its face") (citations and internal quotation marks omitted), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93

L.Ed.2d 44 (1986); *United States v. Darland,* 626 F.2d 1235, 1238 (5th Cir.1980) ("[T]he testimony of a co-indictee alone can provide sufficient evidence to support a conviction."); *United States v. Trevino,* 565 F.2d 1317, 1319 (5th Cir.) (referring to uncorroborated accomplice testimony and noting that "such testimony is sufficient to support a conviction"), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1613, 56 L.Ed.2d 63 (1978); *United States v. Rodriguez,* 498 F.2d 302, 311 (5th Cir.1974) (holding that "[the accomplice's] testimony constituted a sufficient evidentiary basis" for conviction); *United States v. Curry,* 471 F.2d 419, 422 (5th Cir.) ("[A]n accomplice's uncorroborated testimony is sufficient to support a conviction in federal court ...."), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973); *Patterson v. United States,* 413 F.2d 1001, 1003 (5th Cir.1969) ("The evidence against Patterson came almost entirely from [an alleged accomplice].... It is well settled that such testimony can be the basis for a conviction."); *Smith v. United States,* 343 F.2d 539, 544 (5th Cir.) ("The long standing federal rule ... is that the uncorroborated testimony of an accomplice is sufficient to convict ...."), *cert. denied,* 382 U.S. 861, 86 S.Ct. 122, 15 L.Ed.2d 99 (1965); *McClanahan v. United States,* 230 F.2d 919, 922 (5th Cir.) ("A conviction may rest upon the uncorroborated testimony of an accomplice."), *cert. denied,* 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956).

█ It would be anomalous for us to hold that even though a codefendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause. We do not mean that any co-defendant confession, however outlandish, will suffice to establish probable cause irrespective of the circumstances. For example, the confession of a mental patient that he and the suspect, aided by an army of little green men, committed the crime clearly would not pass muster. Nor would a co-defendant's confession establish probable cause as to the suspect if the confession so far contradicted known facts that no reasonable officer would believe it. But that will not be the case with most co-defendant confessions, and it is not

what we have here. Newsome's confession was not on its face incredible. Moreover, it was consistent with the description of the crime given by the only surviving eyewitness, Laverne Bailey, who identified Newsome as one of the two perpetrators.

Newsome unequivocally incriminated not only Craig but also Newsome himself, thus bringing to bear notions of reliability associated with statements against penal interest. *Cf.* Fed.R.Evid. 804(b)(3) (hearsay exception for statements against interest). That Newsome incriminated himself as well as Craig ensured that his statements about Craig were "reasonably trustworthy information," which is all probable cause requires. *See, e.g., Ortega v. Christian,* 85 F.3d 1521, 1524 (11th Cir.1996) ("Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.' ").

It might be argued that the notions of reliability associated with statements against interest are undercut by the interest that co-defendants have in shifting relative blame among themselves. Anyone involved with the criminal justice system knows that a confessing co-defendant, although admitting guilt of the basic crime, will often claim that a particularly serious or blameworthy act during the crime was done not by him but by a colleague in crime. For example, it was in Newsome's best interest to say that Craig rather than he was the shooter in this robbery-murder, and that is what he did say. However, even when a co-defendant's confession seeks to shift some of the blame to another, the co-defendant's admission of guilt to the core crime is enough indication of "reasonably trustworthy information" to satisfy probable cause. Look at it this way. Even if the detectives should have assumed for some reason that Newsome and not Craig was the shooter, the result is the same. For purposes of determining whether there was probable cause to arrest Craig for a felony, it matters not whether he was the robber who shot or the robber who did not. Ordinarily, unless it is incredible or contradicts known facts to such an extent no reasonable officer would believe it, a co-defendant's confession that he and the suspect committed the crime

can supply probable cause to arrest the suspect.

■ We are aware that other information and evidence known to the detectives before or just after Newsome's confession also supports our conclusion that probable cause existed around the time of Newsome's confession. For example, before either Newsome or Craig were questioned, Detective Nelson had received an anonymous tip that they were the two who had committed the robbery-murder. An anonymous tip does not, of itself, satisfy probable cause requirements, *see, e.g., Taylor v. Alabama,* 457 U.S. 687, 689–90, 102 S.Ct. 2664, 2666, 73 L.Ed.2d 314 (1982), but it is information that may be considered if corroborated, *see, e.g., Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990) (an anonymous tip corroborated by other police work "exhibited sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop"). In this case, the tip the detectives received was corroborated, most importantly by Newsome's confession, and therefore it is a fact that a reasonable police officer would consider in making a probable cause determination.

■ There are other facts supporting a determination of probable cause. At the time Detectives Singer and Nelson first approached Craig to question him, he told them that his name was Kenneth Maurice Oliver, and he presented the detectives with false identification bearing that name. Only when confronted with a photograph of himself did Craig admit his true identity. Law enforcement officers may, when making a probable cause determination, legitimately take into account the fact that a suspect has given them, or otherwise used, a false name. *See, e.g., United States v. Tipton,* 3 F.3d 1119, 1123 (7th Cir.1993) (giving false name to investigatory officers); *United States v. Travis,* 993 F.2d 1316, 1324 (8th Cir.) (use of false identities), *cert. denied,* 510 U.S. 883, 114 S.Ct. 229, 126 L.Ed.2d 184 (1993); *United States v. Milner,* 962 F.2d 908, 913 (9th Cir.) (possession of airline ticket with false name on it), *cert. denied,* 506 U.S. 1004, 113 S.Ct. 614, 121 L.Ed.2d 548 (1992); *United States v. Maldonado,* 735 F.2d 809, 815 (5th Cir.1984) (giving false name to investigating officer).

■ There are also the results of the polygraph examinations, the last of which was completed just ten minutes after Newsome confessed. Detective Mote, who administered the polygraph examinations, testified they indicated that when he denied involvement, Craig "was not telling the truth, he was lying about the incident." Detective Mote reported those results to Detective Singer before Craig was arrested. Indications of deception on a polygraph examination may be taken into account in determining whether probable cause exists. *See Marx v. Gumbinner,* 905 F.2d 1503, 1507 (11th Cir.1990). Thus the anonymous tip, the fact that Craig initially attempted to deceive the detectives about his identity, and the fact that the two polygraph examinations indicated he was being deceptive when he denied involvement in the crime are all evidence that properly could be considered in determining whether probable cause existed after Newsome confessed and implicated Craig.

In any event, we hold that Newsome's confession that he and Craig committed the robbery-murder constituted reasonably trustworthy information which would cause a prudent person to believe that Craig had committed a felony. Accordingly, there was probable cause to arrest Craig from the time Newsome confessed at 5:30 p.m., which was before Craig was under arrest, in custody, seized for Fourth Amendment purposes. It follows that neither of Craig's confessions was the product of an illegal arrest.

## IV. CONCLUSION

The district court's denial of Craig's 28 U.S.C. § 2254 petition for a writ of habeas corpus is AFFIRMED.

GODBOLD, Senior Circuit Judge, concurring in part and dissenting in part, in which HATCHETT, Chief Judge, and BARKETT, Circuit Judge, join:

The issue before us is whether there was probable cause to arrest the defendant Craig. I concur in the result and in the holding that

under the totality of circumstances there was probable cause to arrest. I dissent from the holding that the statement of the co-defendant, standing alone, was sufficient to establish probable cause.

The Supreme Court and this circuit have steadfastly required that analysis of probable cause to arrest must be an inquiry into the "totality of circumstances." *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). "We consider the relevance of factors such as the informant's veracity, reliability, and bases of knowledge." *U.S. v. Gonzalez,* 969 F.2d 999, 1003 (11th Cir.1992, citing *Illinois v. Gates* ). In *Ortega v. Christian,* 85 F.3d 1521, 1525 (11th Cir. 1996), Chief Judge Hatchett carefully set out the multitude of factors that must be examined before determining whether the statement of an informant provides probable cause to arrest. He mentions the following: corroboration of the details of the tip through independent police work; whether the informant has made a statement against his penal interests; whether the informant had personal knowledge; whether there is a past history between the informant and the police department that supports his reliability; whether the police took independent steps to investigate the tip.

In *Von Stein v. Brescher,* 904 F.2d 572 (11th Cir.1990), this circuit set out the principle governing an officer's probable cause to arrest:

> A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Id.* at 578. In the present case the court correctly describes corroborating facts known to arresting officers which, when considered together with Newsome's statement implicating Craig as the shooter, constituted probable cause to arrest. These corroborating facts included the corroborated tip from an informer; the fact that Craig gave a false name and false identity; the results of poly-graph tests; a consistent description of the crime given by witness Bailey; and the fact that Newsome spoke against his own penal interest.

Newsome's words, considered with the corroborating circumstances, meet the requirement of inquiry into the "totality of circumstances" required by *Illinois v. Gates,* consideration of the informant's "veracity, reliability, and basis of knowledge" required by *Gonzalez,* and of the factors set out in *Ortega.* When this totality of circumstances is considered, along with Newsome's statement, this court can, and does, properly conclude that there was probable cause to arrest Craig. That should be the end of this court's decision. Unfortunately the court addresses another question, not necessary to its disposition of this case; whether Newsome's statement, by itself, without consideration of the surrounding circumstances, could have constituted probable cause. And it finds that Newsome's statement alone was enough.

> However, even when a co-defendant's confession seeks to shift some of the blame to another, the co-defendant's admission of guilt to the core crime is enough indication of "reasonable trustworthy information" to satisfy probable cause.

Op., p. 1045.

> In any event, we hold that Newsome's confession that he and Craig committed the robbery-murder constituted reasonable trustworthy information which would cause a prudent person to believe that Craig had committed a felony.

Op., p. 1046.

> It would be anomalous for us to hold that even though a co-defendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause.

Op., p. 1045.

These holdings are qualified by only the possibility that the co-defendant's statements are "outlandish" or so contradict known facts that no reasonable officer would believe them. Op., pp. 1045–1046. These limiting qualifications are held not to be present, and

Newsome's confession, standing alone, is held to meet the standard of "reasonably trustworthy information which could cause a prudent person to believe that Craig had committed a felony." Op., p. 1046.

*No case,* I repeat, *no case,* is cited that permits the determination of probable cause to arrest on a narrower and less stringent standard than required by *Illinois v. Gates, Gonzalez, Von Stein,* and *Brescher.* This body of law is not addressed, and indeed not even recognized.

Arguably one might consider "reasonably trustworthy information" possessed by Newsome as including his knowledge of surrounding facts relevant to the constitutional requirements of the *Illinois v. Gates* line of cases, i.e., to consider that knowledge as subsumed into "reasonably trustworthy information." But plainly this is not what the en banc court is doing. Rather, intentionally and advisedly, it strips out all factors other than the co-defendant's statement and holds that the words of a co-defendant's statement—naked, unvarnished, and uncorroborated—carry their own credentials of trustworthiness and can constitute probable cause unless a court views them as incredible or inconsistent with known facts.

The body of authority relied on by the en banc court consists of case law concerning sufficiency of the testimony of a co-conspirator or accomplice to support a conviction. (op. pp. 1045–1046). The opinion concludes (p. 1045):

> It would be anomalous for us to hold that even though a co-defendant' uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause.

There is no anomaly. Sufficiency of the evidence to support a conviction implicates the decision of a judicial officer, made following indictment, sworn trial testimony, the right to counsel, the right to object, cross-examination, and the confrontation clause, and, if it reaches constitutional levels, concerns the Fifth Amendment. This body of law cannot be carried over and treated as controlling an issue that implicates the decision of a policeman on the beat or in the station house, arising in a wholly different procedural context, and, if it reaches a constitutional level invokes the Fourth Amendment. The en banc opinion cites no case that applies cases of sufficiency of the evidence at trial to the decision of the policeman on the beat or in the station house. Rather the opinion simply concludes that it would be anomalous not to apply them.

Our court can do better than to create a new principle of law where its decision is unnecessary to disposition of the case, conflicts with the established caselaw, and relies upon a body of law not related to the issue for decision.