**[Cite as *State v. Brown*, 2021-Ohio-2193.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190755 |
| | | TRIAL NO. 19CRB-10233 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| MAURICE BROWN, | : | |
| Defendant-Appellee. | : | |


Criminal Appeal From:  Hamilton County Municipal Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 30, 2021


*Andrew W. Garth*, Interim City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Philip A. Worsham,* Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Arenstein & Gallagher* and *William R. Gallagher,* for Defendant-Appellee.

**ZAYAS, Presiding Judge.**

{¶1} The state of Ohio appeals from the judgment of the Hamilton County Municipal Court granting defendant-appellee Maurice Brown's motion to suppress evidence obtained after a stop and search of his vehicle. For the following reasons, we affirm the trial court's judgment.

## Factual Background

{¶2} On April 17, 2019, Maurice Brown was charged with possession of drug paraphernalia. Brown filed a motion to suppress the paraphernalia arguing that the officer did not have a reasonable suspicion of criminal activity to justify the stop of his vehicle and the length of the detention after the stop to await a drug sniffing canine.

{¶3} At the hearing on the motion, the sole witness was Officer Sullivan. Sullivan testified that he was working as an undercover police officer for the Cincinnati Police Department on April 17, 2019. Sullivan had been an officer for 13 years and had spent the past two years with "Violent Crimes." He received extensive training in drug interdiction and drug-trafficking operations by the Desert Snow Black Asphalt Company. Sullivan was trained to recognize signs and signals of drug trafficking.

{¶4} Sullivan had been conducting drug-trafficking surveillance of the UR Mart ("Mart") located at 111 East McMicken Street for two to three months due to a high activity of drug trafficking of crack cocaine at the Mart. Over the course of his investigation, he had noticed a pattern of individuals loitering in the parking lot and engaging in hand-to-hand transactions with persons driving into the parking lot.

{¶5} On that particular day, Sullivan again observed several individuals

loitering outside the store. As cars pulled up and parked, those individuals would approach the vehicles and engage in hand-to-hand transactions with the occupants of the vehicles. Sullivan observed an individual pull up in a red pickup truck. Sullivan recognized the driver through prior felony drug arrests. Sullivan observed the driver of the pickup truck engage in a hand-to-hand transaction at his truck. After the transaction, the truck left the parking lot.

{¶6} Sullivan also observed Maurice Brown sitting in his vehicle, which was parked at the curb behind the red pickup truck. When the red truck drove out of the Mart, Sullivan observed Brown leave the Mart behind the red pickup truck.

{¶7} Sullivan began following the red pickup truck and relayed his observations of the drug transaction conducted by the driver of the red pickup truck to two uniformed officers, Officers Wood and Tye. The two uniformed officers activated their cruiser lights and stopped the pickup truck for a traffic violation. When the truck was pulled over, Brown, who was behind the pickup truck and the officers' vehicle, stopped his car momentarily. Sullivan testified that Brown then "slow rolled, and it appeared that he was looking over at the officers who were conducting the traffic stop and getting that occupant out of the vehicle" as he passed the vehicles. Sullivan further explained:

> At that point, I felt like, with the drug transactions that had been going on and Mr. Brown being behind the vehicle, that there was more to it than what meets the eye as far as – we have – when we conduct controlled purchases and surveillance and observe drug transactions, oftentimes the dealers will follow the buyer to some extent. That's to check and see if they are police or if they are a confidential informant,

3

things of that nature. So that heightened my awareness.

So those are my concerns. So they follow – lots of times they relay information back to – they act as counter surveillance. They'll relay information back to individuals that are trafficking at those specific locations. So that was my concern, that there was more going on than meets the eye.

{¶8} Sullivan was asked, "So I got that you were paying attention because you were concerned about a dealer following a buyer?" Sullivan responded, "Correct." Sullivan further testified that the basis for the stop of Brown was "for drug investigation."

{¶9} Brown drove into the casino parking garage, and Sullivan followed him into the parking garage. Although Sullivan did not see any traffic violations, he requested that a uniformed officer pull over Brown's vehicle for a drug investigation. Sullivan watched Sergeant Veelay initiate the stop of Brown. A K-9 officer and dog were requested. The dog arrived 18 minutes later, and after Sullivan instructed the canine officer, the dog alerted on Brown's car. Brown's car was searched, and a digital scale with residue was found in the car. A lab result identified the residue as cocaine.

{¶10} On cross-examination, Sullivan testified that he had never seen Brown or his vehicle at the Mart prior to that day. During his three to four months of surveillance, Sullivan had witnessed at least 20 drug transactions, and all of them involved hand-to-hand transactions where drivers purchased drugs then drove off. Most of these transactions were controlled buys. Sullivan had never seen Brown or anyone else follow a buyer out of the parking lot. He admitted that a dealer following

a buyer was not a pattern at the Mart, but he had seen it while surveilling other locations.

{¶11} Sullivan further testified that it appeared that Brown was engaged in conversation at the Mart, but he did not know if Brown was talking on his phone. Sullivan did not observe Brown engage in any transaction with the driver of the red truck or one of the loiterers selling drugs. Sullivan conceded that Brown had not violated any laws at the time he was stopped and detained.

{¶12} The court granted the motion to suppress, and the state now appeals.

Law and Analysis

{¶13} In its sole assignment of error, the state asserts that the trial court erred in granting the motion to suppress. The state contends that the perceived counter surveillance, observed by Sullivan, constitutes sufficient reasonable articulable suspicion of criminal activity to serve as the basis for conducting an investigatory stop.

{¶14} Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. *State v. Showes*, 1st Dist. Hamilton No. C-180552, 2020-Ohio-650, ¶ 9. "We must accept the trial court's findings of fact if they are supported by competent and credible evidence, but we review de novo the application of the relevant law to those facts." *Id.* Here, the parties do not dispute the facts, so we review the trial court's legal determination de novo. *See id.*

{¶15} It is well-established that a law enforcement officer may temporarily detain an individual where he has a reasonable articulable suspicion that the individual is engaging in criminal activity. *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988), citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d

889 (1968). An officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* at 21. A court must consider the totality of the circumstances in evaluating the facts and inferences supporting the stop. *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus.

{¶16} "Reasonable suspicion entails a minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, ¶ 14, quoting *State v. Jones*, 70 Ohio App.3d 554, 556-557, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27. "A police officer may not rely on good faith and inarticulate hunches to meet the *Terry* standard of reasonable suspicion." *Jones* at 557.

{¶17} In this case, Sullivan admittedly did not see Brown commit a traffic violation or engage in a hand-to-hand drug transaction. Sullivan conceded that Brown had not violated any laws at the time he was stopped and detained. Rather, Sullivan had Brown stopped to investigate drug dealing because he "felt like, with the drug transactions that had been going on and Mr. Brown being behind the vehicle, that there was more to it than what meets the eye."

{¶18} Sullivan's belief was based upon his experience that drug dealers often conduct counter surveillance on drug buyers to ensure the buyer is not a police officer or confidential informant, and then communicate that information to the individuals selling drugs at that location. However, Sullivan admitted that he had never seen that type of activity occur at the Mart during his two to three months surveillance of the Mart. Sullivan suspected that Brown was a drug dealer

conducting counter surveillance because Brown was behind the pickup truck at the Mart, Brown drove out of the Mart behind the pickup truck, and Brown slow-rolled and looked in the direction of the officers pulling over the pickup truck.

{¶19} The state argues that these facts are sufficient to justify an investigative stop because Sullivan suspected that Brown was engaged in counter surveillance. To support its argument, the state cites to numerous cases that concluded the officers had sufficient facts indicative of drug trafficking to stop the defendants.

{¶20} For example, in *State v. Ramirez*, the court found the following facts created a reasonable suspicion that defendant was engaged in drug trafficking and justified the initial investigatory stop of defendant's vehicle:

> Officer Helton knew that Ramirez was traveling with a red Dodge with a passenger who had a criminal history of marijuana trafficking, both vehicles had Texas license plates, Texas is a source state of illegal drugs, and although both vehicles were allegedly driving to Cleveland, Ramirez exited onto a road that does not lead to Cleveland. Additionally, it was established that the red Dodge sped up upon sight of the police. Testimony was heard in the trial court that such a tactic is common in trafficking drugs. That is, the vehicle not carrying contraband will attempt to draw attention away from the vehicle carrying the drugs.
>
> Additionally, Ramirez was observed engaging in suspicious activity. Other police officers witnessed Ramirez park his truck in a Hardee's lot, and walk a considerable distance to a motel lobby to wait for

someone. Eventually, Ramirez was met by someone driving a blue Toyota. The Toyota was observed driving in a large square and appeared to be conducting counter-surveillance.

*State v. Ramirez*, 9th Dist. Medina No. 04CA0024-M, 2004-Ohio-6541, ¶ 8-9.

{¶21} In *State v. Brown*, the appellant argued that the affidavit in support of the search warrant did not contain sufficient facts to establish probable cause. *State v. Brown*, 9th Dist. Summit Nos. 23076 and 23080, 2006-Ohio-6749, ¶ 6. The affidavit contained "detailed information from three informational sources indicating that drug activity was taking place at appellant's residence." *Id.* at ¶ 11. After surveilling the home, officers observed drug activity at the home. *Id.* at ¶ 2. Additionally, the vehicles that were stopped upon leaving appellant's residence indicated that drug activity was occurring there. *Id.* at ¶ 11. A vehicle registered to appellant contained marijuana, and a drug dog alerted to the presence of narcotics on a truck and trailer previously seen at appellant's residence. *Id.* Finally, the officers observed counter surveillance by appellant. *Id.*

{¶22} In *United States v. Del Vizo*, the Ninth Circuit Court of Appeals found that officers had probable cause to arrest Del Vizo for narcotics trafficking after they received a confidential informant's tip regarding a home in Torrance and observed Del Vizo and his associates over the course of five days. *United States v. Del Vizo*, 918 F.2d 821, 822 (9th Cir.1990). The officers corroborated that tip by observing Del Vizo and six accomplices picking up packages, delivering and leaving a van in various locations, removing boxes from the van and a home, picking up cargo, and engaging in counter surveillance by traveling together, circling the area, making U-turns, driving faster than the speed limit, and frequently pulling the van to the right curb to

let traffic go by before resuming driving. *Id.* at 826-827. In concluding that the officers had probable cause to believe that Del Vizo was engaged in criminal activity, the court was "impressed by the wealth of information gathered by the officers and the extent to which that information revealed a 'pattern of activity' indicating participation in a narcotics transaction." *Id.* at 827.

{¶23} In all of the cases cited by the state, the officers articulated sufficient facts to support reasonable suspicion of organized drug trafficking. In each case, the observed counter surveillance was merely one factor to support that the accused was engaged in drug dealing. Moreover, in each of those cases, multiple people worked together trafficking in large quantities of drugs.

{¶24} Here, in contrast to the cases cited by the state, Sullivan did not articulate any fact, other than perceived counter surveillance, indicating that Brown was a drug dealer. Sullivan believed that Brown was a drug dealer engaging in counter surveillance. Sullivan defined counter surveillance as a drug dealer following a buyer to determine whether the buyer is a police officer or confidential informant and communicating that information to the other drug dealers at that location. There is no evidence that Brown was a drug dealer or that he was working with the individuals selling drugs at the Mart. Although it appeared to him that Brown was engaged in conversation while at the Mart, Sullivan did not specify with whom he may have been speaking and admitted that Brown could have been on the phone. Notably, Sullivan did not observe Brown communicating with any specific individuals selling drugs at the Mart or relaying any information to anyone after observing the stop of the red pickup truck.

{¶25} Sullivan had been surveilling the Mart for two to three months and had

never seen anyone conducting counter surveillance after a hand-to-hand transaction. Moreover, Sullivan had never seen Brown or his vehicle at the Mart during this time. The fact the Brown's car was behind the pickup truck and that Brown may have looked at the officers while passing the pickup truck is insufficient to establish reasonable suspicion of drug trafficking. Absent any specific, articulable facts indicating that Brown was engaged in drug trafficking, Sullivan's "hunch" that Brown was conducting counter surveillance was insufficient to establish a reasonable suspicion to believe that Brown was committing a crime. *See Jones*, 70 Ohio App.3d at 557, 591 N.E.2d 810.

{¶**26**} Accordingly, we overrule the sole assignment of error.

## Conclusion

{¶**27**} Having overruled the state's sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.